A96A2085. JORDAN v. THE STATE.
(477 SE2d 583)

ELDRIDGE, Judge.

Following a bench trial, Christopher Jordan was found guilty of driving with an unlawful drug present in his blood or urine, operating a motor vehicle with no insurance, and driving without a license in his possession; appellant was found not guilty of driving with an expired tag. He appeals.

The record shows that a Lawrenceville police officer, operating an unmarked police car, noticed appellant driving through a high crime area in Gwinnett County; the officer's attention was drawn to appellant because the officer had not seen appellant's vehicle in the area before, and appellant was a white male in a predominantly black community. The officer followed appellant. As appellant pulled

into a Texaco service station, the officer noted that appellant's Kansas license tag was expired. The officer pulled in behind appellant's parked car, and when appellant exited the Texaco convenience store, the officer asked him for his license and proof of insurance; appellant had neither. The officer detected the odor of marijuana on appellant's clothing. Appellant was given the *Miranda* warnings and voluntarily made a statement that he had smoked marijuana that morning and had smoked crack cocaine the day before. Appellant was placed under arrest and read the implied consent information. The officer requested a urine sample for chemical testing, to which procedure appellant agreed; appellant requested a breath test, which request was honored. At trial, a forensic chemist testified that the urinalysis performed on appellant's sample was positive for the presence of cocaine, as well as cocaine metabolites.

1. In a two-pronged argument, appellant contends that the trial court erred in finding that the police officer had probable cause to stop appellant. First, appellant argues that the officer's stop of appellant for operating a vehicle with an expired tag was pretextual since the officer testified that his suspicions were aroused because appellant was a white driver in a "high drug area." Second, appellant argues that even if the stop was not simply pretext, the officer was not justified in detaining appellant for driving with an expired Kansas tag because no Georgia law is violated by such an act. Thus, appellant contends that his statements and the results of his urinalysis should have been suppressed as derived from an illegal stop.

Appellant's arguments are not well taken. The first ignores that appellant was not stopped, but *followed* because of the officer's suspicions. The evidence was uncontroverted that the officer did not approach and, thus, "stop" appellant until after the officer saw that the license tag on appellant's car was expired. That appellant was driving on an expired Kansas license tag is a fact appellant has never denied, and we find that the evidence supports the trial court's determination that, regardless of the officer's debatable reasons for following appellant's car, the actual stop was based upon appellant's operation of a vehicle with an expired tag. *Wilder v. State*, 192 Ga. App. 891, 892 (386 SE2d 685) (1989); *Carter v. State*, 192 Ga. App. 726 (386 SE2d 389) (1989).

Appellant's second argument is equally meritless. Appellant contends that an out of state driver has no obligation to register his vehicle in Georgia, and this state has no interest in the collection of tax revenues for a vehicle with an out of state tag that is not registered herein; thus, the stop of a vehicle based on its operation with an expired *out of state tag* is not justified since no Georgia law is violated by such an act. Taking appellant's argument to its logical conclusion, the citizens of Georgia could avoid ad valorem taxes on vehi-

cles altogether through the convenient attachment of an expired out of state license tag, since an officer could never justifiably stop a vehicle to investigate the use thereof. However, fortunately for law enforcement and contrary to appellant's assertions, an investigative stop can be utilized to determine *if* a law is being broken. This is the type of brief detention authorized by *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968), in order to "balance intrusion against crime prevention *or law enforcement.*" (Emphasis supplied.) *State v. Adams*, 186 Ga. App. 87, 88 (366 SE2d 326) (1988). What is required by an officer is a "founded suspicion" as a basis from which a court can determine that the stop was not merely arbitrary, capricious, or harassing. *Tedford v. State*, 213 Ga. App. 252, 254 (444 SE2d 156) (1994). In the case sub judice, the police officer was justified in approaching the appellant to determine if the operation of appellant's motor vehicle with an expired Kansas license tag was in violation of OCGA § 40-2-8 (b). See *Wilder*, supra at 892. There was no error.

2. For a myriad of reasons, appellant contends that the results of his urine drug tests were inadmissible. We disagree.

With regard to the foundational requirements for the admission of urine drug test results, OCGA § 40-6-392 (a) (1) (A) states: "Chemical analysis of the person's blood, urine, breath, or other bodily substance, to be considered valid under this Code section, shall have been performed according to methods approved by the Division of Forensic Sciences of the Georgia Bureau of Investigation [hereafter GBI] on a machine which was operated with all its electronic and operating components prescribed by its manufacturer properly attached and in good working order and by an individual possessing a valid permit issued by the Division of Forensic Sciences for this purpose." Thus, in order to meet the requirements for admissibility of a urinalysis under this Code section, the State must introduce evidence that: (1) the test was performed under methods approved by the GBI; (2) on a machine which was in good working order; and (3) by an individual with a valid permit to conduct such testing. See *Lewis v. State*, 215 Ga. App. 486, 488 (451 SE2d 116) (1994).[1]

In the case sub judice, Dr. Horton McCurdy, a toxicologist with the Forensic Sciences Division of the GBI, was qualified as an expert for the state; the doctor testified as to his training on the urinalysis instruments, his authority to perform urine drug tests, and the

---

[1] Appellant argues that this Court's reliance on our decision in *Lewis*, supra, would be misplaced because the legislative amendments to OCGA § 40-6-392 (a) (1) (A) became effective after the *Lewis* decision. This argument ignores the fact that the language of the statute setting out the requirements for admissibility did not change from one legislative incarnation to the other.

methods he utilizes to perform these tests. Appellant did not object to any of Dr. McCurdy's qualifications or procedures. Dr. McCurdy testified that both of the instruments he used were in good working order pursuant to statutory requirements, and that he had tested each machine prior to performing appellant's urine drug tests. In addition, the State introduced a certificate of inspection for each instrument which demonstrated compliance with the statutory requirements; Dr. McCurdy also testified that each machine is checked for accuracy prior to the performance of any test thereon. The doctor testified that he possessed a valid permit from the GBI for the operation of the machines. Thereafter, Dr. McCurdy testified in detail as to each test that he had performed on appellant's urine sample, how it was performed, and the results thereof.

This Court finds that the testimony of Dr. McCurdy was sufficient to meet the foundational requirements of OCGA § 40-6-392 (a) (1) (A) for the admission of the evidence of appellant's urine drug tests, and the results of those tests. *Lewis,* supra at 488; *Martin v. State*, 214 Ga. App. 614, 617 (448 SE2d 471) (1994). Appellant's complaints regarding the length of time that had elapsed between the original certification of the machines and the date of appellant's urinalysis goes to the weight and not the admissibility of the evidence, especially in light of Dr. McCurdy's testimony that the machines are tested regularly and were working properly pursuant to statutory requirements at the time of appellant's urinalysis. See *Lattarulo v. State*, 261 Ga. 124, 126 (401 SE2d 516) (1991) (evidence that machine might have malfunctioned relates to weight rather than admissibility). In point of fact, Dr. McCurdy's testimony, alone, was sufficient to demonstrate compliance with the statute without the submission of the certificates of inspection.[2] Appellant has not shown that he has been harmed by their admission. *Scott v. State*, 213 Ga. App. 84, 88 (444 SE2d 96) (1994).

Appellant also challenges the methods whereby the tests were conducted and submits for this Court's review seven pages of the lengthy Rules of the GBI in order for us to determine the "total absence" of any GBI-approved method by which to conduct urine

---

[2] The requirements for the formal certification of an instrument, and the promulgation of rules therefor under OCGA § 40-6-392 (a) (1) (A), relate to breath test instruments, such as the Intoximeter 5000, which certification attempts to ensure correct results and aid in the introduction of this evidence at trial. Ga. L. 1995, p. 1160; Ga. L. 1995, Ex. Sess., p. 5; see OCGA §§ 40-5-67.1 (j); 40-6-392 (f). With regard to blood and urine tests conducted in a GBI clinical laboratory setting, the requirements of OCGA § 40-6-392 (a) (1) (A) are satisfied with the testimony of the forensic toxicologist regarding his training and authorization, as well as his testimony regarding the performance of the instrument, the performance of the chemical tests, and the results thereof. Compare OCGA § 40-5-67.1 (g) (2) (F); see *Lewis,* supra at 489; *Martin,* supra at 617.

testing. Further, appellant challenges Dr. McCurdy's authorization to conduct a urine drug test. This Court finds that these challenges have been waived by appellant's failure to raise objection thereon in the court below. *Jackson v. State,* 217 Ga. App. 485, 488 (458 SE2d 153) (1995).

In addition, appellant contends that the results of his urine drug tests are inadmissible because the officer failed to follow the requirements of OCGA § 40-5-67.1 (a) which, according to appellant, mandate that either a breath test or a blood test must be given before the officer may require a urine test.

We note at the outset that in the case sub judice, appellant received a breath test and a urine test; thus, even under appellant's reading of OCGA § 40-5-67.1 (a), there was substantial compliance with the statute. See OCGA § 1-3-1 (c). Further, a violation of OCGA § 40-5-67.1 (a) would not necessarily affect the admissibility of appellant's urine drug test pursuant to OCGA § 40-6-392 (a) (1) (A). See *State v. Hassett,* 216 Ga. App. 114 (453 SE2d 508) (1995), relying on *Keenan v. State,* 263 Ga. 569 (436 SE2d 475) (1993) (discussion of OCGA § 40-5-67.1 (g) (2) in relation to criminal trials).

Nonetheless, in order to clarify the seemingly contradictory language between OCGA §§ 40-6-392 and 40-5-67.1 (a) regarding the authority of law enforcement to choose the appropriate chemical test in DUI cases, and in order to forestall this issue from arising in the future, we address appellant's interpretation of the requirements of OCGA § 40-5-67.1 (a).

In support of his contention that a blood or breath test must be given before a urine test can be performed, appellant cites that portion of OCGA § 40-5-67.1 (a) which states: "the officer shall require a breath test or a blood test and may require a urine test." However, in constructing a statute so as to give effect to the legislative intent, a mere segment of the statute should not be lifted out of context and construed without consideration of all the other parts of the statute. *City of Jesup v. Bennett,* 226 Ga. 606, 609 (176 SE2d 81) (1970). Moreover, OCGA § 40-5-67.1 must be read in concert with OCGA §§ 40-5-55 and 40-6-392, which are expressly referenced therein, in order to effectuate the purpose of the statutes. *City of Brunswick v. Atlanta Journal & Constitution,* 214 Ga. App. 150, 153 (447 SE2d 41) (1994); *State v. Leviner,* 213 Ga. App. 99, 100 (443 SE2d 688) (1994).

The reading of these statutes, in conjunction with those opinions that have interpreted them, demonstrates that a law enforcement officer has the authority to choose which chemical test, breath, blood, urine or other bodily substance, will be administered. OCGA § 40-5-55 (a) (law enforcement officer designates which tests administered); OCGA § 40-6-392 (person shall undergo either breath, blood, urine or other test at the request of law enforcement officer); OCGA § 40-5-

67.1 (b) (1), (2), (3) (breath, blood, urine or other test under OCGA § 40-5-55 administered at designation of law enforcement officer); *Steed v. City of Atlanta*, 172 Ga. App. 839 (325 SE2d 165) (1984) (law enforcement officer shall designate which tests administered); Op. Atty. Gen. 77-21 (arresting officer designates which chemical test to be taken by driver). Where possible, effect is to be given to all the words of a statute, and it is firmly established that courts should not interpret a statute so as to render parts of it surplusage or meaningless. *City of Brunswick*, supra at 153; *State of Ga. v. C. S. B.*, 250 Ga. 261, 263 (297 SE2d 260) (1982); *Saleem v. Bd. of Trustees &c. of Atlanta*, 180 Ga. App. 790, 791 (351 SE2d 93) (1986). Thus, that portion of OCGA § 40-5-67.1 (a) cited by appellant, read in pari materia with OCGA §§ 40-5-55 and 40-6-392, cannot require that either a blood or breath test be given before a urine test is administered without contradicting the plain language in all three statutes regarding the police officer's authority to designate which chemical test is to be utilized, blood, breath, urine or other bodily substance. Therefore, it is safe to assume the legislature had something else in mind. *City of Brunswick*, supra at 153; *Brown v. City of Marietta*, 214 Ga. App. 840 (449 SE2d 540) (1994).

What that something else may be becomes more apparent upon consideration of the purpose for chemical testing under these statutes, i.e., detection, via the least intrusive and least expensive method, of the source of impairment suspected by the officer in order to support a prosecution for DUI thereon. See Ga. L. 1995, p. 1160; Ga. L. 1995, Ex. Sess., p. 5. To that end, it must be understood that a breath test will not detect drugs; a urine test will not necessarily reflect blood alcohol content accurately; and a blood test, the most complicated, intrusive and expensive of the three, may be utilized to detect both drugs and an accurate blood alcohol content, if the officer is unsure which substance is causing impairment. See Turkula, Drug & Alcohol Testing, § 6.01, Biological Sources for Testing, p. 6-1 (1990). Given the essentially odorless nature of most drugs, the detection of the source of impairment in DUI cases where drug use is suspected, but not assured, is often a shot in the dark, especially when alcohol is also involved; thus, either a breath test or blood test will be the choice of most officers. However, in those instances where an officer is able to narrow down the cause of impairment to drug use, either through a confession as in the case sub judice, or through the presence of marijuana odor or drug paraphernalia, it would be absurd to construe OCGA § 40-5-67.1 as requiring a totally useless breath test or an expensive, intrusive, and complicated blood test when a urinalysis, which is the most commonly used, accurate and reliable method for the detection of major drugs of abuse, would better serve the purpose of the statute. See Turkula, supra, § 6.03,

Urine Testing Techniques, pp. 6-6–6-7. Surely, the legislature did not intend to elevate one test over another, but intended to require an inexpensive, appropriate test for the detection of the suspected source of impairment. Statutes must be construed in order to square with common sense and sound reasoning, as well as to effectuate the purpose of the General Assembly. *City of Brunswick*, supra at 153.

In addition, appellant's interpretation of OCGA § 40-5-67.1 (a) ignores that "statutes directing the mode of proceeding by public officers, designated to promote method, system uniformity, and dispatch in such proceeding, will be regarded as directory if a disregard thereof will not injure the rights of parties, and the statute does not declare what result shall follow non-compliance." *Southern Security Co. v. American Discount Co.*, 55 Ga. App. 736, 740 (191 SE 258) (1937); *O'Neal v. Spencer*, 203 Ga. 588 (47 SE2d 646) (1948); *Lang v. State*, 168 Ga. App. 693, 696 (310 SE2d 276) (1983). OCGA § 40-5-67.1 (a) establishes an administrative procedure with regard to chemical tests. Ga. L. 1995, Ex. Sess., p. 5. Non-compliance does not exact a penalty under the statute and produces no injury to the parties. Thus, the language of OCGA § 40-5-67.1 (a) is not mandatory, and an officer's decision to require a urine test for drugs, rather than a blood or breath test, does not violate the provisions of the statute.

Consequently, this Court rejects appellant's statutory interpretation and finds that OCGA § 40-5-67.1 (a) authorizes a law enforcement officer to designate the appropriate chemical test to be administered, breath, blood, urine or other bodily substance, for the detection of the source of impairment as suspected by the officer.

3. In his final enumeration of error, appellant challenges the chain of custody with regard to the urine sample because the arresting officer's description of the packaging of the sample differed from the description of this evidence by the forensic toxicologist.

A chain of custody is sufficiently established when circumstances establish a reasonable assurance of the identity of the sample. *Fedd v. State*, 194 Ga. App. 475, 476 (391 SE2d 24) (1990). The State's burden is met with a showing that, with reasonable certainty, the evidence examined is the same as that seized and that there has been no tampering or substitution; where there is only a bare speculation of tampering, it is proper to admit the evidence and "let whatever doubt remains go to its weight." (Citation and punctuation omitted.) *Kerr v. State*, 205 Ga. App. 624, 626 (423 SE2d 276) (1992).

In the case sub judice, the arresting officer testified that he took possession of the urine sample, sealed the plastic container with red tape, sealed the container in a plastic evidence bag, and placed the evidence bag, along with two pieces of accompanying paperwork, in a locked evidence refrigerator at the police department. The transport officer testified that he removed the evidence bag from the refrigera-

tor and transported it to the crime lab, along with the two pieces of accompanying paperwork; the bag and paperwork were locked in the crime lab's blood locker. The forensic chemist testified that he removed the sealed evidence bag from the blood locker and that the container with the urine specimen was still sealed with red tape; at trial the chemist had in his possession the two pieces of accompanying paperwork from the police department, both of which were tendered into evidence.

This evidence was sufficient to establish the chain of custody. *Fedd*, supra at 476. The trial court determined that any contradictions in the arresting officer's description of the initial packaging of the evidence and the toxicologist's description of the way the package looked when it arrived at the crime lab did not suggest tampering, but a faulty memory on the part of the officer caused by the 14-month period since the incident. The record demonstrates that this determination was not clearly erroneous; thus, there was no error in the admission of this evidence. *Dunn v. State*, 218 Ga. App. 329, 330 (461 SE2d 294) (1995).

*Judgment affirmed. McMurray, P. J., and Johnson, J., concur.*

DECIDED SEPTEMBER 27, 1996 —
RECONSIDERATION DENIED OCTOBER 15, 1996 — 

*Rich & Smith, Randolph G. Rich*, for appellant.
*Gerald N. Blaney, Jr., Solicitor, William Z. Meadows, Richard E. Thomas, Assistant Solicitors*, for appellee.