## A00A2382. SWANSON v. THE STATE.
### (545 SE2d 713)

BARNES, Judge.

A jury found Kenneth Earl Swanson guilty of three counts of homicide by vehicle, three counts of feticide by vehicle, and two counts of driving under the influence. Swanson appeals, contending the trial court erred by (1) denying his motion to suppress the results of a blood test; (2) denying his motion to quash two counts of the indictment; (3) denying his plea in abatement and motion to quash challenging the array of the grand jury that indicted him; and (4) improperly restricting his counsel's closing argument. For the reasons that follow, we affirm.

1. Swanson contends the trial court should have suppressed a test of his blood showing a blood alcohol concentration of 0.31 grams for three reasons: (a) the State intentionally destroyed the blood sample and prevented him from independently testing it; (b) the State failed to establish the chain of custody for the blood sample; and (c) the police officer failed to give him a timely implied consent warning.

(a) Swanson claims that the trial court should have granted his motion to suppress the blood test results because the State destroyed the blood sample before he had an opportunity to independently test it.

In order to prevail upon a claim that his due process rights under the Fourteenth Amendment to the U. S. Constitution were violated by the destruction of "potentially useful evidence,"[1] Swanson must show bad faith. *Arizona v. Youngblood*, 488 U. S. 51, 57-58 (109 SC 333, 102 LE2d 281) (1988); *Walker v. State*, 264 Ga. 676, 680 (3) (449 SE2d 845) (1994); *Milton v. State*, 232 Ga. App. 672, 679 (6) (503 SE2d 566) (1998). Bad faith is a question of fact for the trial court to determine, and we will not disturb a trial court's finding on bad faith if there is any evidence to support it. *Milton*, supra, 232 Ga. App. at 679; *Lynott v. State*, 198 Ga. App. 688, 690 (4) (402 SE2d 747) (1991).

In this case, the trial court made the following findings:

> The court can find no evidence to show "bad faith" on the part of law enforcement which resulted in the destruction of the blood sample. The Crime Lab might well have been negligent or careless in their handling of the blood sample in view of the oral announcement concerning the preservation of the sample. The District Attorney's office may well have

---

[1] This case differs from our recent opinion in *State v. Blackwell*, 245 Ga. App. 135 (537 SE2d 457) (2000), cert. granted, December 1, 2000. In *Blackwell*, the defendant's urine sample initially tested negative for drugs. In this case, the only test of the defendant's blood revealed a blood alcohol concentration well above the legal limit.

been negligent or careless in failing to follow up on the oral request, but there is no evidence that the sample was destroyed out of an interested or sinister motive, or through a conscious doing of wrong. The evidence shows, and the court so finds, that the evidence was destroyed at the time that the Crime Lab guidelines indicated that it should be destroyed. Defendant produces no evidence that the Crime Lab or anyone acting for the State of Georgia intentionally destroyed the evidence or had the evidence destroyed as a result of improper motive, such as keeping exculpatory evidence from the defendant.

We have reviewed the record and find evidence to support these findings. As a result, we affirm the trial court's decision to allow the blood test results into evidence.

(b) We find no merit in Swanson's claim that the State failed to establish a sufficient chain of custody.

Where the State seeks to introduce evidence of a fungible nature, it must show a chain of custody adequate to preserve the identity of the evidence. [Cit.] The burden is on the State "to show with reasonable certainty that the evidence is the same as that seized and that there has been no tampering or substitution." [Cits.] The State need not negative every possibility of tampering, and "need only establish reasonable assurance of the identity" of the evidence. [Cit.] "(W)hen there is only a bare speculation of tampering, it is proper to admit the evidence and let what doubt remains go to the weight." [Cit.]

*Anderson v. State*, 247 Ga. 397, 399 (2) (276 SE2d 603) (1981).

We have reviewed the chain of custody evidence and find that the State established reasonable assurances of the identity of the blood samples. Discrepancies in the testimony about the color of the test tube caps, the description of the package received by the crime lab, or which officer took custody of the tubes after the blood was drawn do not preclude admission of the blood test results.[2] See *Jordan v. State*, 223 Ga. App. 176, 182 (3) (477 SE2d 583) (1996) (chain of custody established even though arresting officer's description differed from the forensic toxicologist's description of the urine sample's packaging); *Jackson v. State*, 188 Ga. App. 834, 837-838 (3) (374

---

[2] Swanson's contention that there was also a discrepancy in the testimony about the writing on the label of the test tubes is not supported by the record. We have reviewed the testimony cited by Swanson and find no inconsistency in the testimony on this issue.

SE2d 777) (1988) (chain of custody established despite discrepancies in description and number of tablets tested by crime lab); *Carver v. State*, 175 Ga. App. 599, 601 (2) (333 SE2d 697) (1985) (chain of custody established even though testimony differed about how the evidence was delivered to the crime lab and to whom it was delivered).

The fact that evidence was temporarily stored in a police officer's car trunk and an unlocked refrigerator at the sheriff's patrol post also fails to render the chain of custody evidence insufficient. See *Sanders v. State*, 243 Ga. App. 216, 217-218 (1) (a) (534 SE2d 78) (2000) (chain of custody established even though evidence remained in Drug Enforcement Administration agent's trunk for days); *Floyd v. State*, 187 Ga. App. 27 (1) (369 SE2d 316) (1988) (chain of custody established even though blood vials were stored in unlocked refrigerator before being sent to crime lab for testing).

The trial court properly ruled that these facts could be considered by the jury in its determination of the weight to be given to the blood test results.

(c) Swanson asserts the trial court should have granted his motion to suppress blood test results because he was not read the implied consent warning at the time of his arrest as required by Georgia law. See OCGA § 40-6-392 (a) (4); *Perano v. State*, 250 Ga. 704 (300 SE2d 668) (1983).

> When we review a trial court's decision on a motion to suppress, the evidence is construed most favorably to uphold the findings and judgment of the trial court; the trial court's findings on disputed facts and credibility are adopted unless they are clearly erroneous and will not be disturbed if there is any evidence to support them.

(Citations and punctuation omitted.) *State v. Williams*, 225 Ga. App. 736, 737 (1) (484 SE2d 775) (1997).

In this case, the record shows that the arresting officer testified in a motion hearing that he thought he gave the implied consent warning to Swanson at the scene of his arrest, but could not swear to it. In a later motion hearing, the officer could testify, after reviewing his report, that he read the implied consent warning to Swanson at the time of his arrest. Since there is evidence to support the trial court's finding that the officer gave Swanson a timely implied consent warning, we find no merit in this enumeration of error.

2. We find no merit in Swanson's claim that the trial court should have quashed Counts 1 and 4 of the indictment because the State failed to allege that his per se DUI violation (OCGA § 40-6-391

(a) (5)) was the proximate cause of the victims' deaths. These counts stated:

## COUNT ONE

in the name and behalf of the citizens of Georgia, charge and accuse Kenneth Earl Swanson with the offense of Homicide by Vehicle, for that the said accused, in the County of Towns and State of Georgia, on the 11th day of July, 1997, did, without malice aforethought, cause the death of Maria Rubi, another living person, through the violation of OCGA § 40-6-391 (a) (5), to wit: did drive and was in actual physical control of a moving vehicle while having a blood alcohol concentration of .10 grams and more at a time within three hours after said driving, from alcohol consumed before said driving ended, contrary to the laws of this State, the good order, peace and dignity thereof.

. . .

## COUNT FOUR

and the Grand Jurors aforementioned, in the name and behalf of the citizens of Georgia, charge and accuse Kenneth Earl Swanson with the offense of Feticide by Vehicle, for that the said accused, in the County of Towns and State of Georgia, on the 11th day of July, 1997, did cause the death of an unborn child so far developed as to be ordinarily called "quick" by causing injury to Maria Rubi, the mother of the child, through a violation of OCGA § 40-6-391 (a) (5), to wit: the accused did drive and was in actual physical control of a moving vehicle while having an alcohol concentration of .10 grams and more at a time within three hours after said driving, from alcohol consumed before said driving ended, contrary to the laws of this State, the good order, peace and dignity thereof.

The allegation in these counts that the victims' deaths were caused by Swanson's per se violation adequately alleges proximate cause. *Tidwell v. State*, 216 Ga. App. 8, 10 (1) (453 SE2d 64) (1995) (allegation that the defendants' actions "resulted" in the victim's death adequately asserted proximate cause).

3. We also find no merit in Swanson's claim that the indictment should have been quashed because the list of potential grand jurors was drawn from the 1980 Census instead of the 1990 Census. According to Swanson, the use of the 1980 Census resulted in a violation of his rights under the Sixth Amendment to the U. S. Constitution

because citizens in the 18 to 24 age group were underrepresented in the grand jury pool.

To prevail on his Sixth Amendment jury pool composition challenge, Swanson must show that the 18 to 24 age group is a "cognizable group" and that this group has been consistently underrepresented in the Towns County grand jury pool. *Potts v. State*, 259 Ga. 812, 813 (1) (388 SE2d 678) (1990).

> To show that a group is distinct or cognizable under the sixth amendment, a defendant must show: (1) that the group is defined and limited by some factor (i.e., that the group has a definite composition such as by race or sex); (2) that a common thread or basic similarity in attitude, ideas, or experience runs through the group; and (3) that there is a community of interest among members of the group such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process. [*Willis v. Zant*, 720 F2d 1212, 1216 (11th Cir. 1983), cert. denied, 467 U. S. 1256 (104 SC 3548, 82 LE2d 851) (1984).]

Id. at 813.

In this case, the trial court found that "the Defendant did not produce evidence that this group was cognizable for purposes of Grand Jury selection." We must accept this finding unless it is clearly erroneous. *Bryant v. State*, 268 Ga. 664, 665 (2) (492 SE2d 868) (1997). Our review of the record shows that the trial court did not clearly err.

4. In his remaining enumeration of error, Swanson claims the trial court denied him "his rights to due process and effective assistance of counsel when it curtailed [his] counsel's proper closing argument to the jury and by admonishing [his] counsel in the presence of the jury." The record shows that the trial court precluded defense counsel from outlining in great detail "the three standards of proof" in "ancient Scotland and Wales," as well as the preponderance of evidence standard in civil cases.

"The trial court has the right and duty to govern the scope of argument both before and after the presentation of evidence, and the proper range of argument is a matter within the trial court's discretion." *Miller v. State*, 243 Ga. App. 764, 766 (7) (533 SE2d 787) (2000). Although counsel may refer to applicable law in closing argument, they should not present law about which the court will *not* charge the jury. *Kirkland v. State*, 271 Ga. 217, 219 (3) (518 SE2d 687) (1999). In this case, the trial court, appropriately, did not charge the jury on the standards of proof in civil cases or in ancient Scotland and Wales. Thus, it did not abuse its discretion when it prohibited defense coun-

sel from confusing the jury with inapplicable law.

*Judgment affirmed. Eldridge, J., concurs. Blackburn, C. J., concurs specially.*

BLACKBURN, Chief Judge, concurring specially.

Although I agree with the judgment and analysis of the majority, I concur specially in order to set out the factual basis for the majority's decision on Swanson's chain of custody argument.

After a detailed review of the evidence, we cannot say that the trial court erred in holding that the State had produced sufficient chain of custody evidence. Swanson's contentions as to opportunities for tampering with the evidence went to the weight of the evidence, not its admissibility. See *Jordan v. State*.[3] In the present case, as in *Jordan*, a significant amount of time had passed between the date of the incident and the time of trial (27 months herein and 14 months in *Jordan*). Rather than testifying as to their handling of Swanson's blood samples, the majority of the witnesses testified to their normal procedure for handling blood samples in DUI cases. Small discrepancies can be explained by faulty memory rather than evidence of tampering. See id. (trial court's admission of evidence was not clearly erroneous where it determined that contradictions in the arresting officer's description of the initial packaging of the evidence and toxicologist's description of the way the package looked when it arrived at the crime lab did not suggest tampering, but a faulty memory).

In the present case, Swanson contends that the chain of custody was not established because Judy DeCrisci's testimony regarding the color of stoppers she would have used on top of the vials of blood contradicted Trooper Mathis' and Dr. Brown's testimony regarding the vials of blood tested. Trooper Mathis testified that he received the vials of blood in a biohazard bag and that they were topped with gray stoppers. Dr. Brown testified that he received at the crime lab two vials of blood topped with gray stoppers. Swanson relies on DeCrisci's testimony wherein she testified that if she drew two vials of blood her normal procedure would have been to top the vials with one red stopper and one gray stopper. However, she further testified that if the evidence in the present case established that two vials of blood were drawn and both were topped with gray stoppers such evidence would not be cause for concern because sometimes a certain tube is requested or sometimes the hospital was out of red stoppers.

Swanson also contends DeCrisci's testimony regarding the information which she put on the vials of blood did not match Dr. Brown's description of the blood he tested. DeCrisci testified that she would

---

[3] *Jordan v. State*, 223 Ga. App. 176, 182 (3) (477 SE2d 583) (1996).

put the person's name, date, time, Social Security number, and her initials on each vial. On cross-examination by Swanson's attorney, she testified that if all of the described information was not on the *vial*, she would not believe that it was the sample she took. Dr. Brown testified from a report prepared by the person who opened the package at the crime lab and assigned a laboratory case number to the sample. He explained that the crime lab would be interested in only the name on the blood vials; if there was other information on the blood vials, it would not be noted on the report. Dr. Brown could not remember specifically what information was on the vials of blood involved in this case other than what was noted on the report. Dr. Brown testified that the vials had the defendant's name on them. He did not testify that the other information described by DeCrisci was not contained on the vials in addition to the name that was listed on the report.

Swanson argues that the testimony conflicted as to how the vials were taped and packaged. Officer Garrison was present in the room when DeCrisci drew blood from Swanson. He testified that "to the best of [his] recollection" DeCrisci drew two vials of blood and put them into a Styrofoam container. He further testified that he did not see DeCrisci tape up the vials or the box. DeCrisci, Trooper Mathis, and Dr. Brown testified that the two vials of blood were taped with transparent tape and put into a biohazard bag. Officer Garrison's testimony is equivocal at best.

Swanson correctly points out the conflicts in the evidence as to who received the blood samples from DeCrisci. DeCrisci testified that she gave the samples to Officer Garrison. Officer Garrison testified that he left the sample with DeCrisci. Trooper Mathis testified that he picked up the blood from DeCrisci. DeCrisci was not sure who took the samples from the hospital, and she did not know whether Officer Garrison left the samples for Trooper Mathis. Such evidence would have supported a finding of a potential for tampering with the evidence. It does not, however, require a finding of a break in the chain of custody. See cases cited in majority.

Additionally, Swanson erroneously contends that Officer Garrison signed a form indicating that he received the blood samples. DeCrisci testified, and the record confirms, that the form signed by Officer Garrison requested that the blood tests be performed. It was not a receipt for the blood samples.

Swanson next contends that the chain of custody was not established because the blood was kept in the trunk of Trooper Mathis' police car overnight and then kept in an unlocked refrigerator for several days before it was mailed by an unknown person. The evidence, however, supports a finding that from the time the blood samples were taken from the hospital, they were taped securely and

placed in a sealed and taped biohazard bag. The evidence indicates that this bag was intact when the blood was received at the crime lab.

Trooper Mathis testified that after leaving the blood samples in his trunk overnight he took them into the station and packaged them for mailing before leaving them in the station refrigerator. Trooper Mathis packaged the blood samples on a Saturday so they were not mailed until the following Monday or Tuesday. Trooper Mathis further testified that no one got into his patrol car overnight while the blood samples were in the trunk and that the public did not have access to the refrigerator where the packaged blood samples were left. See *Sanders v. State*[4] and *Floyd v. State*[5] cited by the majority. Any issue of spoliation of evidence is not before us.

Finally, Swanson contends that the chain of custody was not established because Dr. Brown's testimony conflicted with Trooper Mathis' testimony regarding how the blood samples were packaged for mailing. Again, the transcript authorizes a determination that any conflicts regarding the packaging of the samples were based on faulty memory rather than evidence of tampering. Trooper Mathis testified that he could not remember for sure but that he thought he packaged the blood samples in Styrofoam boxes for shipping. The station had switched policies as to how the samples were shipped. Trooper Mathis testified that he put the samples either in Styrofoam boxes or in metal cans. Dr. Brown testified that the blood samples arrived in a sealed metallic mailing cylinder. Contrary to Swanson's argument, there was no conflict in the testimony of Dr. Brown and Trooper Mathis regarding the packaging of the blood vials because Trooper Mathis testified that he might have put the blood sample in a metallic mailing cylinder. Even if the alleged conflict had existed, it would not have been sufficient for a break in the chain of custody. See *Jordan*, supra.

Based on the foregoing testimony, the trial court's decision to allow the test results into evidence was not clearly erroneous.

DECIDED MARCH 12, 2001 — ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Head, Thomas, Webb & Willis, William C. Head*, for appellant.
*N. Stanley Gunter, District Attorney, Lynn Akeley-Alderman, William J. Langley, Assistant District Attorneys*, for appellee.

---

[4] *Sanders v. State*, 243 Ga. App. 216, 217-218 (1) (a) (534 SE2d 78) (2000).
[5] *Floyd v. State*, 187 Ga. App. 27 (1) (369 SE2d 316) (1988).