**FIRST DIVISION**
**BARNES, P. J.,**
**BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 30, 2022**

# In the Court of Appeals of Georgia

A22A0406. THE STATE v. NIXON.

HODGES, Judge.

Kenneth Nixon was indicted on two counts of aggravated assault. He moved to dismiss these charges following the loss of a video from a Ring doorbell system, which he contends would have provided exculpatory evidence supporting his assertion that he was acting in self-defense. After a hearing, the trial court granted his motion, and the State appeals the dismissal of the charges. The State contends that the trial court erred in (1) improperly finding that the Ring video was constitutionally material and that it had exculpatory value apparent to law enforcement prior to its loss; (2) finding that the information in the video could not be obtained by other reasonably available means; and (3) failing to determine whether law enforcement

acted in bad faith by not preserving the Ring video. For the reasons that follow, we reverse.

The record shows that on August 28, 2019, two investigators with the Douglas County Sheriff's Office were called to investigate an alleged stabbing. One investigator went to the home where the stabbing allegedly occurred, and the other went to the hospital where two alleged victims, Keith Hunter and Dennis Edwards, had been taken for treatment. Hunter and Edwards are the adult sons of Nixon's girlfriend, Katrina Walker. Walker and Nixon had been living with Hunter and Edwards' uncle, and the stabbing allegedly occurred at the uncle's home.

When investigator Melinda Wright went to the home, she found Nixon sitting on a power box in front of the house. She observed "a knot on his head and a swollen jaw." The sheriff's office's investigative report described the injuries as "superficial." Nixon told Wright that he had borrowed a car belonging to Edwards, that Edwards did not like it, and that what began as a verbal altercation ended in a physical altercation. Nixon denied stabbing the other men. He told the investigator he had been upstairs moving a television when one of the men hit him in the face and the other "jumped in[.]"

2

Edwards, however, told the investigator that Nixon, his mother's boyfriend, had stabbed him and Hunter. Edwards denied that he and Hunter ever got "physical" with Nixon. Hunter told police that he and Edwards were standing outside the home when a male, whom he had never seen before, approached and without provocation, stabbed him and his brother. The sheriff's office's investigative report, however, stated that no blood was found in the driveway and that blood was found on the closet door outside Nixon's room, where Nixon said the altercation occurred. No weapon was found. Both Hunter and Edwards had stab wounds in their lower right abdomen areas.

The uncle's residence, where the incident allegedly occurred, had a Ring doorbell system with a camera which recorded some of the men's interactions outside the house. Wright, along with another investigator, Darrell Black, watched the Ring video, with the uncle's permission, on the uncle's cellphone. The video was not continuous, as it was motion-activated.

The uncle e-mailed the video to Black, and Black looked at his phone and saw that he had received an e-mail, but he did not view it at that time. The video was e-mailed on September 1, 2019. That same day, Black began uploading evidence to the sheriff's department's operating system, which is used for all reports and evidence.

Black indicated in his report that he intended to download the Ring video and enter it into evidence. He downloaded photographs and other evidence from discs, thinking "that the Ring video was on there[,]" but, in fact, did not download the Ring video. Black testified this was a "[l]ack of experience and just being new to investigations and just making [a] human error mistake."

In January 2020, the State contacted Wright seeking a copy of the Ring video, and Wright responded that "the video is in evidence." Wright then asked Black to check on the video and thought no more about it until October 2020, when both Nixon and the State requested the video. Black looked for the video on his computer, his desktop, an external drive, and in his e-mail folders, including those for deleted e-mails. He did not have it, and realized he had not logged it in to evidence. He testified that his usual practice was to "bulk delete" e-mails when his inbox got full, and that he did not observe anything on the Ring video that made him think it should be deleted.

After realizing that the Ring video could not be found, Wright unsuccessfully attempted to contact the uncle, and a sheriff's department IT specialist searched the department's e-mail server, but the video could not be located. The sheriff's department had switched to a new computer system in October 2020, and "the old

4

hard drives from all the previous computers which would have retained the e[-]mail had been destroyed[,]" making the e-mail "unrecoverable."

Nixon then moved to dismiss the charges against him, contending that the lost Ring video would have provided exculpatory evidence supporting his assertion that he was acting in self-defense. The trial court granted Nixon's motion to dismiss the charges, and the State filed the instant appeal.

1. The State first argues that the trial court erred in granting the motion to dismiss because it improperly found the Ring video to be constitutionally material, in that it had exculpatory value apparent to investigators before it was lost. Finding error, we agree.

Our review of a trial court's dismissal of an indictment based upon whether a "due process violation occurred as a result of the [State's] destruction of the [evidence] is a mixed question of law and fact. We review the court's factual conclusions under the clearly erroneous standard and the court's legal conclusions de novo." *United States v. Revolorio-Ramo*, 468 F3d 771, 772, 774 (II) (11th Cir. 2006); see also *State v. Scott*, 344 Ga. App. 744 (811 SE2d 457) (2018) (finding that "[w]hen considering an appeal of a trial court's order on a motion to dismiss and/or quash an indictment, we review the trial court's interpretations of law and application of the

5

law to the facts de novo and its findings of fact for clear error" in case addressing

dismissal of indictment based upon claims that the State violated defendant's rights

under *Garrity v. New Jersey*, 385 U. S. 493 (87 SCt 616, 17 LE2d 562) (1967), which

involves 14th Amendment protections against coerced confessions).[1]

---

[1] We note that our appellate courts appear not to have previously addressed which standard of review should apply to cases involving the potential dismissal of an indictment based upon alleged due process violations stemming from governmental loss or destruction of evidence. Nixon, indeed, argues that the standard of review should be abuse of discretion. However, the cases Nixon cites in support of this contention do not, unlike the instant case, involve issues implicating due process. Nixon cites *State v. Brooks*, 301 Ga. App. 355, 358-359 (687 SE2d 631) (2009) (finding an abuse of discretion where the trial court dismissed an indictment "based on [defendant's] compliance with [a] judicial hold order and did not mention an alleged due process violation[;]" even though the issue of a destroyed evidentiary video was discussed during the hearing, defendant "never filed a motion to dismiss the accusation based on an alleged due process violation") and *State v. Mack*, 231 Ga. App. 499 (499 SE2d 355) (1998) (reviewing for abuse of discretion the grant of a motion to dismiss accusation where defendant argued that the State failed to adequately charge defendant with any offense). Relying upon *Revolorio-Ramo*, 468 F3d at 774 (II), which addressed, albeit in the federal context, the due process issue of whether governmental destruction of exculpatory evidence required dismissal of an indictment, see id. at 772, we have reviewed the contentions of error under the "clearly erroneous" rather than "abuse of discretion" standard. See *Perez v. State*, 283 Ga. 196, 198 (657 SE2d 846) (2008) ("Decisions of the 11th Circuit are not binding on [our appellate courts], but they are persuasive authority.") Under either the "clearly erroneous" or "abuse of discretion" standard, however, the trial court in the instant case erred in dismissing the indictment, as the evidence at issue does not meet the standards for constitutional materiality.

In evaluating whether a defendant's constitutional right to due process was violated when the state failed to preserve evidence that could be exculpatory, a court must determine both whether the evidence was material and whether the police acted in bad faith in failing to preserve the evidence. To meet the standard of constitutional materiality the evidence must possess an exculpatory value that was apparent before it was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

(Citation omitted.) *Ash v. State*, 312 Ga. 771, 787 (4) (865 SE2d 150) (2021); see also *State v. Mussman*, 289 Ga. 586, 590 (2) (713 SE2d 822) (2011) (applying this test where the State failed to preserve evidence that "could have been exculpatory, but where it is not known that the evidence would have been exculpatory," and reversing Court of Appeals determination that the State had committed a due process violation, where, assuming without deciding that the lost evidence was material, there was no evidence of bad faith) (emphasis omitted); *State v. Miller*, 287 Ga. 748, 754 (699 SE2d 316) (2010) (finding that the "threshold inquiry" is "whether the subject evidence is so material to the defense that it is of constitutional import" and that the exculpatory value of such evidence must, inter alia, be apparent before it is lost or destroyed).

At the hearing on the motion to dismiss, Black testified that he recalled the video showing Hunter and Edwards in a verbal argument with Nixon, but that the video "did not show anything physical that I saw[,]" nor did it show any of the men threatening each other. The sheriff's office's investigative report stated that the video showed Hunter and Edwards confront Nixon in the driveway and begin arguing. Black testified that the video showed all three men go into the residence, with Hunter and Edwards following Nixon. Black could hear yelling but could not understand what they were saying because "[t]he audio was inaudible."[2] Once the brothers were

---

[2] In response to repeated questions from Nixon's counsel regarding whether the Ring video showed the Hunter and Edwards threatening Nixon, Black testified, "I don't remember that[,]" or that he recalled only "yelling" or "fussing." Asked yet again if he recalled threats, Black testified more specifically, "I do not recall that, ma'am. The audio and the video . . . *was inaudible. I could not really understand most of the conversation* – or the yelling because there was a lot of yelling from inside the residence. The Ring camera was on the outside and the microphone is facing away from the interior of the residence. *I couldn't make out what they were saying*." (Emphasis supplied.) It is clear from this context that Black was not testifying that he had forgotten details from the Ring video; rather, he was testifying that he did not recall anything that matched what Nixon's counsel was suggesting, because he had not been able to hear or understand the audio in the first place. A video's sound recording that cannot be understood because it is "inaudible" does not, in this case, meet the standard for constitutional materiality. It does not have the exculpatory value that it "must possess." *Ash*, 312 Ga. at 787 (4). This is so because Nixon's ability to "obtain comparable evidence by other reasonably available means," id., would not be exculpatory in this instance, given that truly "comparable evidence" would be "inaudible" and incapable of being understood.

8

outside, Black could hear the uncle telling them to get out of his house. He saw the uncle, outside the house, look at Hunter's injuries and tell Edwards to drive Hunter to the hospital. Black testified that the video did not impact his investigation, but merely corroborated what Edwards had told him about the argument, the driving of the car, and the men going into the house. Black's interpretation of the video "at the time did not make or break the case."

Wright testified that after she watched the video, "I felt we had enough probable cause to show that Mr. Nixon had stabbed the two boys." She testified that she could see on the video that Edwards was "very vocal about being upset" that Nixon had used his car, that she could hear a "verbal argument," and that she saw Nixon enter the residence with the other two men "behind him; they're just arguing." Then the video showed Edwards and Hunter taking clothes out of the house, and the investigator saw Edwards and Hunter coming out. Hunter "is holding his side and [Edwards] is saying, 'He stabbed my brother, Bro. He stabbed my brother.'" Then the uncle "told those boys to go to the hospital." Wright testified that the video was significant to her because it told the story of the crime, and because Edwards "had said that his mother's boyfriend had stabbed him as well."

9

In granting the motion to dismiss, the trial court found that the evidence had "apparent exculpatory value that cannot be obtained by other reasonably available means[.]" Our Supreme Court "has defined 'apparent' in this context as 'readily seen; visible; readily understood or perceived; evident; obvious.'" *Ash*, 312 Ga. at 789-790(4), citing *State v. Mizell*, 288 Ga. 474, 476 (2) (705 SE2d 154) (2011).

As the investigators testified, however, while they recalled that the video showed the men verbally arguing, it showed no physical contact between them and recorded no threats made by any of the men. Black testified that the video did not impact his investigation, but merely corroborated what Edwards had told him about the argument, the driving of the car, and the men going into the house. Black's interpretation of the video "*at the time* did not make or break the case." (Emphasis supplied.)

Nixon argues on appeal that because the police took out warrants charging Hunter and Edwards with battery "after viewing the Ring video, [this] shows the video was apparently exculpatory at the time the warrants were taken." However, Nixon points us to no testimony from either investigator indicating that what they observed *on the video* influenced the decision to charge Hunter and Edwards. Rather, Black testified that Hunter and Edwards were charged "due to the injuries on

10

[Nixon's] face[,]" – injuries which Wright testified that she observed first-hand, when she went to the residence and found him sitting outside the house on a power box. The investigative report says that warrants were taken out for Hunter and Edwards "due to the injuries Kenneth Nixon received prior to the stabbing taking place[,]" but does not attribute this conclusion to the Ring video. Nixon has failed to show that the Ring video contained any apparently exculpatory value prior to its loss or destruction. *Ash*, 312 Ga. at 790 (4); see generally *Clay v. State*, 290 Ga. 822, 842 (5) (C) (725 SE2d 260) (2012) (finding no constitutionally material value in missing blood samples where defendant claimed, had the samples been tested, they could have established that he was too intoxicated to have committed the crimes charged, where an expert witness testified that the samples would simply have confirmed defendant's self-report about his drug use, and, thus, the samples did not have an obvious exculpatory value).

Also, the video had some possible inculpatory value, given Wright's recollection that the video depicted Hunter holding his side and Edwards saying, "He stabbed my brother, Bro. He stabbed my brother[,]" and Wright's stated belief that the video showed "probable cause" that Nixon had stabbed Hunter and Edwards. Given, as outlined above, that the testimony indicated only that the video showed the

men arguing, and showed no threats or physical contact, "[t]here was no apparent reason for the police to think that the [video] would tend to exonerate rather that further inculpate [Nixon]. . . . Under all of the circumstances, any contention that [the video] *would have*, as opposed to theoretically *could have*, supported [Nixon's] defense . . . was pure speculation." (Citation and punctuation omitted; emphasis in original.) *Johnson v. State*, 289 Ga. 106, 109-110 (4) (709 SE2d 768) (2011). "[T]he fact that evidence may be 'potentially useful' in a defendant's attempt at exoneration is insufficient to sustain a claim that the defendant has suffered an abridgment of due process of law due to the destruction or loss of the evidence." *Miller*, 287 Ga. at 754. Thus, the video was not constitutionally material.[3]

---

[3] Because we have found that the video was not constitutionally material, we need not address the State's contention that the trial court erred in finding that the evidence in the video could not be obtained by other reasonably available means. See *Howard v. State*, 262 Ga. 78, 79 (3) (414 SE2d 198) (1992) ("To meet this standard of constitutional materiality, evidence must *both* possess an exculpatory value that was apparent before the evidence was destroyed, *and* be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.") (citation omitted; emphasis supplied); *California v. Trombetta*, 467 U. S. 479, 489 (II) (104 SCt 2528, 81 LE2d 413) (1984) (same); see generally *State v. McNeil*, 308 Ga. App. 633, 637-638 (708 SE2d 590) (2011) (finding that missing evidence was not constitutionally material because, inter alia, the defendant could cross examine responding officers and victim regarding events allegedly recorded on missing DVD).

2. The State further contends that the trial court erred in granting the motion to dismiss because it failed to determine whether law enforcement acted in bad faith in failing to preserve the Ring video.

On appeal, "we accept a trial court's determination as to whether the [S]tate acted in bad faith if there is any evidence to support it[.]" *State v. Brawner*, 297 Ga. App. 817, 821 (678 SE2d 503) (2009); *Swanson v. State*, 248 Ga. App. 551 (1) (a) (545 SE2d 713) (2001) (same).

As we determined in Division 1, the video was not constitutionally material because it amounted to evidence that was only "'potentially useful' in a defendant's attempt at exoneration [and thus was] insufficient to sustain a claim that the defendant has suffered an abridgment of due process due to the evidence's destruction or loss." *Ash*, 312 Ga. at 789 (4). "Moreover, even if the [video] was constitutionally material, the failure to preserve this potentially useful evidence does not violate due process *unless a criminal defendant can show bad faith on the part of the police*." (Citation omitted; emphasis in original.) *Lockheart v. State*, 284 Ga. 78, 79 (2) (663 SE2d 213) (2008). "Bad faith is reserved for 'those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.' In other words, the police must show, by their conduct, some intent to wrongfully

withhold constitutionally material evidence from the defendant." *Mussman*, 289 Ga. at 591 (2), citing *Arizona v. Youngblood*, 488 U. S. 51, 58 (109 SCt 333, 102 LE2d 281) (1988).

While the trial court indeed did not decide whether the police acted in bad faith, it explicitly found that "[e]ven though the evidence clearly shows that [the] State and the [Douglas County Sheriff's Office were] extremely negligent in the handling of the video evidence, the video was not intentionally destroyed."[4] Consistent with the trial court's factual finding, the record shows no evidence of bad faith. See *Clay*, 290 Ga. at 841-843 (5) (B)-(C) (upholding denial of motion and finding no due process violation in the State's destruction of evidence where, "[a]lthough the trial court's written order denied Clay's motion without making factual findings or legal conclusions, at the conclusion of the hearing on Clay's motion, the court orally found nothing 'wilfully wrong' in the GBI's destruction of the blood samples, a finding that is supported by the evidence in the record. Accordingly, Clay has not shown that the State acted in bad faith, and his contention

---

[4] See generally *Brawner*, 297 Ga. App. at 820-821 (reversing dismissal of indictment and finding that the acts of obtaining and losing a videotape, alone, "are insufficient to support a finding of bad faith. There was no evidence of intentional destruction of the videotape or that officers intended to deprive [defendant] of exculpatory evidence.").

14

here is meritless."); compare *Mizell*, 288 Ga. at 477 (2) (reversing trial court's dismissal of indictment where missing evidence was not constitutionally material and not addressing lower court's finding as to whether State acted in bad faith).

Accordingly, for all of the foregoing reasons, we reverse the dismissal of the charges against Nixon. See *McNeil*, 308 Ga. App. at 639.

*Judgment reversed. Barnes, P. J., concurs specially. Brown, J., concurs in judgment only.*

A22A0406. THE STATE v. NIXON.

BARNES, Presiding Judge, concurring specially.

I agree with the majority that the trial court erred in dismissing the charges against Nixon because there was no evidence that the police investigators acted in bad faith in the loss of the Ring video. However, I concur specially because I disagree with the majority's conclusion that the trial court erred in finding that the video was constitutionally material.

It is well-established that the State has a constitutional duty to preserve "evidence that might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488 (II) (104 SCt 2528, 81 LE2d 413) (1984). To satisfy this standard of constitutional materiality, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. at 489 (II). See *Ash v. State*, 312 Ga. 771, 787 (4) (865 SE2d 150) (2021). There was evidence to support the trial court's finding that both prongs of the constitutional materiality test were satisfied here.

2

According to the investigators, the missing Ring video showed that on the day of the incident, Edwards and Hunter were waiting for Nixon outside of their uncle's house; that Edwards was "ranting and raving" about Nixon borrowing his car; that Edwards and Hunter confronted Nixon in the driveway when he drove up to the house and began arguing with him; and that when Nixon walked into the house, Edwards and Hunter followed "right behind" him while continuing their argument, after which yelling could be heard coming from inside the house. As related by the investigators, the video further showed Edwards and Hunter exiting the house while their uncle yelled at them, but then apparently going back into the house, after which Hunter came out of the house holding his side and Edwards came out yelling that "he stabbed my brother." Additionally, Investigator Wright testified that the video was significant because it "was telling us how everything unfolded" and "told the story of what happened." And when asked about the investigation of Edwards and Hunter, Investigator Black testified, "The video shows them following [Nixon] in the house arguing. Due to the injuries on [Nixon's] face, I felt that was sufficient to charge both of them with battery."

The aforementioned evidence, construed in the light most favorable to the trial court's ruling, supported a finding that the Ring video had exculpatory value that was

3

apparent to the investigators before it was lost. Based on the investigators' testimony, the video showed that Edwards and Hunter were upset and angry with Nixon, that they waited outside to confront him when he arrived at their uncle's house, that they approached Nixon and argued with him outside of the house and then followed him inside while continuing to argue, and that they then left the house as their uncle yelled at them but then chose to go back inside the house where Nixon remained. Such footage would have assisted Nixon in his claim of self-defense by supporting his assertion that Edwards and Hunter were the aggressors, particularly when combined with the evidence of the injuries he sustained to his face. Consequently, the Ring video would "be expected to play a significant role in [Nixon's] defense," *Trombetta*, 467 U.S. at 488 (II), and would have been "supportive of a claim of innocence." (Citation and punctuation omitted.) *State v. Blackwell*, 245 Ga. App. 135, 138 (2) (b) (537 SE2d 457) (2000). Moreover, Investigator Wright described the Ring video as telling the story of what transpired, and Investigator Black indicated that he looked to both the video and the injuries to Nixon in deciding to charge Edwards and Hunter for committing battery against Nixon. Accordingly, there was evidence to support the trial court's finding that the Ring video possessed an exculpatory value that was apparent before it was lost by the police. See id. Cf. *State v. Brawner*, 297 Ga. App.

4

817, 819 (678 SE2d 503) (2009) (concluding that missing videotape had no apparent exculpatory value, where "the images were distorted, small, and distant," and the detective "testified that he could discern nothing pertinent to the case on the tape").

There also was evidence to support the trial court's finding that Nixon could not obtain comparable evidence by other reasonably available means. The testimony of the investigators reflected that while they could summarize what occurred in the Ring video, their recollections were incomplete, including as to whether Edwards or Hunter could be heard expressly threatening Nixon. Under these circumstances, the investigators' testimony would not be comparable to the recording itself. Accord *Brown v. State*, 264 Ga. 803, 806 (3) (450 SE2d 821) (1994) (noting that a determination as to whether evidence is cumulative may turn on whether it "is of the same or different grade" as the other evidence); *Castaneda v. State*, 360 Ga. App. 316, 322 (1) (a) (861 SE2d 171) (2021) (concluding that video recording was not cumulative of trial testimony because it "provided much greater detail about the [alleged crime] and when the incidents occurred"). Cf. *State v. McNeil*, 308 Ga. App. 633, 637-638 (708 SE2d 590) (2011) (holding that missing DVD that showed officer's pursuit of vehicle and subsequent search and arrest was not constitutionally material, where, among other things, the defendant could cross-examine the officers

5

who had personal knowledge of what had transpired because they were involved in the traffic stop).

For the foregoing reasons, I believe that the trial court was authorized to find that the Ring video was constitutionally material and therefore do not agree with all that is said in the majority opinion. However, I agree that there was no evidence of bad faith by the investigators and thus concur in the judgment.