## A00A1912. BERRY v. THE STATE.
### (547 SE2d 664)

BARNES, Judge.

Pursuant to the grant of an interlocutory appeal, Henry Lorenzo Berry appeals the superior court's denial of his motion to suppress evidence seized from his car after a traffic stop. He contends the trial court erred by holding that the search did not violate Art. I, Sec. I, Par. XIII of the Georgia Constitution (1983) or OCGA § 17-5-1.

The entire incident was videotaped by a camera in the police car, and the video was shown to the court. The video and the officer's testimony show that Berry was traveling alone at about 10:00 a.m. when he was stopped on I-20 by a City of Conyers police officer for driving a car with a dealer's drive-out license tag. The officer was a narcotics officer who apparently was on routine patrol with his drug dog and his partner. The video shows that the two police officers approached the car on both sides and looked in the car.

---

[38] See, e.g., *State v. Bassford*, 183 Ga. App. 694, 698 (2) (359 SE2d 752) (1987).

Although some comments are inaudible, the following is a transcript of the stop as shown on the videotape:

[10:05:23 a.m.]

OFFICER: Hey, how are you doing? May I see your driver's license and insurance please? Mr. Berry, you step out here and I'll explain why I stopped you. I don't like standing with my back to that traffic. The reason I stopped you is that you don't have a tag on it. How long have you had the car?
BERRY: Just rented it and went to see my son in Atlanta.
OFFICER: You rented it.
BERRY: Yes sir.
OFFICER: Where you headed to?
BERRY: I'm going to [inaudible] — Did I do something wrong or something?
OFFICER: It's because you don't have a tag. A lot of times we get a lot of stolen vehicles this way. I mean it's nothing for somebody to come up and take this one off, go to a car lot and put it on there and take off with it.
OFFICER: Where you coming from?
BERRY: Atlanta. See my son.
OFFICER: See your son.
OFFICER: All that rain didn't scare you off, did it?
BERRY: No, it didn't.
OFFICER: How long did you stay?
BERRY: Not that long, I didn't stay long.
OFFICER: A day? Two weeks? A week?
BERRY: Not long.
OFFICER: Not long?
BERRY: Not long.

[10:06:50 a.m. — Officer calls in Berry's driver's license information: black male from South Carolina 001958331.]

OFFICER: You have a regular car of your own?
BERRY: Uh, yes sir.
OFFICER: What is it?
BERRY: Just a pickup.
OFFICER: You got a pickup —. It wasn't in good shape to drive down here?
BERRY: [Nodded head.]
OFFICER: I'm going to run a quick check on your license to make sure everything is all right.
OFFICER: Wherebouts does your son live at in Atlanta?

[10:07:38 a.m.]

BERRY: Uh, uh, Decatur.

[10:07:43 a.m.]

OFFICER: Decatur.
OFFICER: Everything all right; he wasn't sick now was he?
BERRY: Well, I always gotta check on him.
OFFICER: How old is he?
BERRY: 22.
OFFICER: 22.
OFFICER: He going to school down there?
BERRY: No, he's working.
OFFICER: Working. [Officer looks at paperwork.]
OFFICER: They only charged you 80 bucks to rent it?
BERRY: $75, that's with tax.
OFFICER: That's the tax was it?
BERRY: Yes, officer.
OFFICER: That ain't bad.
OFFICER: When did you come down?
BERRY: Early this morning.
OFFICER: Early this morning?
OFFICER: I'm just trying to kill time while we are waiting on the [inaudible].
OFFICER: Is he a good boy? Does he stay in trouble a lot or —?
BERRY: Well, that's why I got to check on him.
OFFICER: You gotta check on him. He never been in —.
BERRY: He don't have a job right now. You got any children, got any children, you know how it is.
OFFICER: I gotta two and a half month old.
BERRY: You ain't getting there yet.
OFFICER: I ain't there yet.
BERRY: You ain't there yet.
OFFICER: All right, you don't have any guns or knives or weapons or anything? You don't mind if I pat you down right quick for my safety? You don't have to put your hands up. You're fine.

[The officer pats down Berry. At 10:09:22 a.m., the officer walks to the front of the car and apparently copies down the vehicle identification number. While he is doing this, the other officer comes from the front of the car and stands by Berry. After copying the VIN, the first officer walks around the car looking in the windows. The officer calls in the VIN at 10:09:57 a.m. and resumes questioning.]

OFFICER: Mr. Henry, how often you travel back and forth?
BERRY: Not much. Whenever my son in trouble.
OFFICER: Whenever he's in trouble.
BERRY: Yeah. I have a sister that lives in [inaudible], but

this time I came to see my son.

OFFICER: You came to see your son.

OFFICER: Um, I-20's a big interstate, runs right here through the City of Conyers. We got a big problem with people with guns, drugs, narcotics, dead bodies, and stuff like that. You don't have anything illegal in your vehicle?

BERRY: No.

OFFICER: Would you mind if I take a quick search of your vehicle?

BERRY: No, not my vehicle.

OFFICER: Well, I mean it's rented to you. So, I mean, that's why I'm asking you.

BERRY: Not really no. I haven't did anything, you know?

OFFICER: You saying I can or can't?

BERRY: Well, I don't, you know, it's up to you, but I said no. I say no.

OFFICER: OK, you say no, OK. That's fine. That's your right to say no, OK?

BERRY: OK.

[10:11:10 a.m.]

OFFICER: All right, Mr. Henry, Mr. Berry, what I'm going to do is, I'm going to ask you to step back here with this officer. I have a narcotics-trained canine in my car. I'm going to walk him around your car real quick and if he doesn't hit, we're going to send you on your way. OK.

[10:11:20 a.m.]

After the dog alerted at several places on the car, the officer searched the car and opened a plastic bag he had seen earlier in the passenger compartment. It contained about eight pounds of marijuana. Berry was arrested and charged with violation of the Georgia Controlled Substances Act: possession of marijuana with intent to distribute.

Although the officer later testified that the rental contract appeared to have been altered, the videotape does not show that he ever questioned Berry about it. At some point, however, the officer confirmed that the contract was valid (the rental agency had made the alterations) and the car was not stolen. The officer testified that he saw no contraband in plain view, but did see a large black garbage bag behind the passenger's seat. He did not smell marijuana.

Subsequently, Berry moved to suppress the marijuana found in the rented car, the trial court denied the motion, and Berry sought and obtained authority to bring this interlocutory appeal from that order.

The trial court's order states:

Henry Lorenzo Berry was stopped while driving on Interstate 20 by a City of Conyers Police Officer, Ken Morgan. Officer Morgan operated the canine (K-9) unit. The defendant was stopped for driving a car with a dealer drive out paper tag. After the stop, Officer Morgan requested his driver's license and insurance, including information on the car. Defendant produced his license and the rental contract. It should be noted that the rental contract on the car appeared to have been altered by the use of a photocopy machine. While the Officer was running a check on the items, he engaged the Defendant in a conversation. It did not appear to be a traditional rental contract form. The discussion between the officer and Defendant was amiable; however, the Defendant's answers were contradictory. The entire stop was videotaped and played for the Court during the hearing on the Defendant's Motion to Suppress. While the license and VIN number of the vehicle were being confirmed, the Officer requested to search the Defendant's vehicle. The Defendant refused to give consent. After this refusal, the Officer used his dog to conduct a "free air search" around the vehicle. The dog alerted and a search ensued whereby contraband was found in the back floorboard of the Defendant's rental vehicle. The officer lawfully stopped the vehicle driven by the Defendant because the vehicle did not have a state-issued tag. While the inquiry of the Defendant's itinerary was ongoing, the Officer noticed the nervousness of the Defendant. According to the Officer, I-20 is increasingly becoming a transportation lane for illegal drugs and narcotics. This case is distinguishable from *Smith v. State*, 216 Ga. App. 453 [ (454 SE2d 635)] (1995) because the Officer did not conduct the "free air search" based solely on a hunch. Furthermore, the inquiry did not relate to a drug inquiry but was simply about the Defendant's travel plans. The questions were not unconstitutionally intrusive when balanced against the danger of drug running on the interstate. An officer must have reasonable suspicion of criminal conduct before conducting additional questioning and searching a vehicle once a normal traffic stop has ended and the officer has told motorists they are free to go. *Simmons v. State*, 223 Ga. App. 781, 782 [(479 SE2d 123)] (1996). The traffic stop was ongoing in this matter and the Defendant had not been given permission to leave. The investigation was appropriate which gave rise to meet the

reasonable suspicion standard. *Jorgensen v. State*, 207 Ga. App. 545, 546 [(428 SE2d 440)] (1993). Therefore, the Defendant's Motion to Suppress is hereby denied.

1. In reviewing the trial court's decision "we must determine whether the officer's action in pulling [Berry] over was justified at its inception, and whether the detention was reasonably related in scope to the circumstances which justified the interference in the first place." (Citation and punctuation omitted.) *Smith v. State*, supra, 216 Ga. App. at 454.

2. Our Supreme Court has established three guiding principles to guide us in reviewing a trial court's order on a motion to suppress:

> First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support it. Second, the trial court's decision with regard to questions of fact and *credibility* must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment.

(Citations and punctuation omitted; emphasis in original.) *Tate v. State*, 264 Ga. 53, 54 (440 SE2d 646) (1994). In this instance, Berry did not testify, and no other witness contradicted the testimony of the officer. Yet, conflicts in the evidence exist because the officer's characterizations of the events are not always consistent with the events as shown on the videotape. The trial court, however, either did not note these inconsistencies or elected not to address them. To the extent the trial court's findings of fact rely upon the officer's testimony which is inconsistent with the objective events recorded on the videotape, we find them clearly erroneous. See *Lyons v. State*, 244 Ga. App. 658 (535 SE2d 841) (2000) (facts discernible in videotape not in dispute).

A significant discrepancy exists between the officer's testimony that he had not completed his investigation of the drive-out tag when he conducted the search with his dog and his statement on the videotape that Berry would be free to go after the dog checked his car.

3. Our initial consideration is whether the traffic stop was authorized. The evidence shows, and the trial court found, that Berry was stopped because he had a drive-out tag on the car. The evidence also shows that the stop was not connected with enforcement of the vehicle registration laws. Instead, the officer testified that he stopped

Berry to investigate whether the car was stolen merely because he did not have a state-issued tag on the car. The officer said, "a lot of times we get a lot of stolen vehicles this way. It's nothing for somebody to come up and take this one off, go to a car lot and put it on there and take off with it."

This is an impermissible basis for a traffic stop. If the officer's rationale for this stop were sufficient to authorize an investigative traffic stop, a stop of any or all motor vehicles on an interstate highway would be authorized because they are often used to transport drugs. Our law is more restrictive than that. Instead, the critical issue to the validity of a traffic stop is whether the officer had "a particularized and objective basis for suspecting the particular person stopped of criminal activity. [Cit.]" (Punctuation omitted.) *Postell v. State of Ga.*, 264 Ga. 249, 250 (443 SE2d 628) (1994). "What is demanded of the police officer, as the agent of the state, is a founded suspicion, some necessary basis from which the court can determine that the detention was not arbitrary or harassing." (Citation and punctuation omitted.) *State v. Fowler*, 215 Ga. App. 524, 525 (451 SE2d 124) (1994).

> Although an officer may conduct a brief investigative stop of a vehicle (see *Delaware v. Prouse*, 440 U. S. 648 (99 SC 1391, 59 LE2d 660) (1979)), such a stop must be justified by *"specific and articulable facts* which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U. S. 1, 21 (88 SC 1868, 20 LE2d 889) (1968). See also *United States v. Brignoni-Ponce*, 422 U. S. 873 (95 SC 2574, 45 LE2d 607) (1975). The U. S. Supreme Court recognized the difficulty in defining "the elusive concept of what cause is sufficient to authorize police to stop a person," and concluded that the essence of the elusive concept was to take the totality of the circumstances into account and determine whether the detaining officer has "a particularized and objective basis for suspecting *the particular person stopped* of criminal activity." *United States v. Cortez*, 449 U. S. 411, 417-418 (101 SC 690, 66 LE2d 621) (1981). "This demand for *specificity* in the information upon which police action is predicated is the central teaching of (the Supreme Court's) Fourth Amendment jurisprudence." *Terry v. Ohio*, supra at 22, n. 18.

(Emphasis supplied.) *Vansant v. State*, 264 Ga. 319, 320 (2) (443 SE2d 474) (1994).

Here, the officer had no "particularized and objective basis for suspecting [*Berry*] of criminal activity." Instead, the officer had a

mere inclination or hunch that any car with a drive-out tag might be stolen. Under these circumstances, the officer was not authorized to pull over Berry. Therefore, the trial court erred by denying his motion to suppress on this basis.

To the extent that *Watson v. State*, 190 Ga. App. 696 (379 SE2d 817) (1989), can be read to authorize a traffic stop because of the possibility that a drive-out tag might be implicated in car theft, it is disapproved and overruled.

4. In addition, even if the initial stop had been authorized, we find that Berry's further detention to conduct the dog search was not reasonable. *Smith v. State*, supra, 216 Ga. App. at 454. At the hearing, the officer testified that the reasons for the search were: Berry's nervousness, his uncertainty about whether his son was working or not, the fact that he was driving a rental car, the rental contract, Berry's looking down the interstate before answering some questions, Berry's failure to remember that his son lived in Decatur, the plastic garbage bag in the backseat, and the long trip from South Carolina only to stay a few hours.

From the evidence discussed above, we are satisfied that this case is controlled by our decisions in *Migliore v. State of Ga.*, 240 Ga. App. 783 (525 SE2d 166) (1999); *State v. Blair*, 239 Ga. App. 340 (521 SE2d 380) (1999); *Simmons v. State*, supra, 223 Ga. App. 781; and *Smith v. State*, supra, 216 Ga. App. 453. These cases found searches unreasonable under almost identical circumstances.

The videotape plainly shows that when the officer decided to conduct the search with his dog, he had abandoned his investigation of Berry's drive-out tag, and he informed Berry that he could leave after the dog walked around the car. Since the dog search was in no way connected to any problem with the license tag, the officer must have had a reasonable suspicion that Berry was transporting drugs. *Simmons v. State*, supra, 223 Ga. App. at 782. We find that the trial court's determination that the officer had such reasonable suspicion is also clearly erroneous.

None of the reasons the officer relied on showed that Berry might be in possession of drugs. Further, even if Berry were nervous, as if most citizens would not be when stopped by the police, "[r]easonable suspicion to detain and investigate for illicit drug activity does not arise from nervousness. . . ." *Migliore v. State of Ga.*, 240 Ga. App. at 786.

> An officer must have reasonable suspicion of criminal conduct before conducting additional questioning and searching a vehicle once a normal traffic stop has ended and the officer has told [the] motorists they are free to go. To meet the reasonable suspicion standard, an officer's investigation during

a traffic stop must be justified by specific, articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct. Although this suspicion need not meet the standard of probable cause, it must be more than mere caprice or a hunch or an inclination.

(Citations and punctuation omitted.) *Parker v. State*, 233 Ga. App. 616, 617-618 (1) (504 SE2d 774) (1998).

In the absence of specific articulable facts supporting a reasonable suspicion of criminal conduct, we must conclude, contrary to the trial court's holding, that the officer's dog search of the automobile was based on merely his "hunch" that drugs might be found in the garbage bag he saw in the car. *State v. Blair*, supra, 239 Ga. App. at 342.

Because the trial court specifically noted that the officer's "inquiry did not relate to a drug inquiry but was simply about [Berry's] travel plans," we are obliged to point out that the questions asked by the officer are part and parcel of the questioning routinely done by officers in the course of these traffic stops. Without such questioning, which is rarely if ever directed toward the reason for the initial stop, the officers would have no basis for later testifying about inconsistent or evasive responses, discrepancies in the travel plans, variations between the responses by the driver and passengers, or unwarranted nervousness. See, e.g., *State v. Blair*, supra, 239 Ga. App. at 340 (conflicting explanations and nervousness); *State v. Hall*, 235 Ga. App. 412, 415 (509 SE2d 701) (1998) (inconsistent responses); *Roundtree v. State*, 213 Ga. App. 793 (446 SE2d 204) (1994) (inconsistencies regarding the purpose and duration of trip and increasing nervousness). Indeed, it is the rare traffic stop drug case in which responses by the driver or passenger to an officer's seemingly innocuous questions are not relied upon by the officer to later justify a search of the vehicle.

Because the officer illegally detained Berry so that he could conduct a search with his dog, this case is distinguished from *Pitts v. State*, 221 Ga. App. 309 (471 SE2d 270) (1996); *State of Ga. v. Montford*, 217 Ga. App. 339 (457 SE2d 229) (1995); *Roundtree v. State*, supra, 213 Ga. App. 793, and other cases that found free air searches to be authorized.

If during an investigatory stop the officer, without an articulable suspicion, proceeds to ask questions unrelated to the reason for the stop, the officer goes beyond the permissible scope of the investigation, and the further detention of the car driver exceeds that permitted by *Terry v. Ohio* and its progeny. To give deterrent effect to the exclusionary rule,

a court must suppress evidence obtained through an excessive detention and investigation.

(Footnotes omitted.) *Almond v. State*, 242 Ga. App. 650, 652 (1) (530 SE2d 750) (2000).

Accordingly, the judgment of the trial court must be reversed and the case remanded to the trial court with direction to grant Berry's motion to suppress.

*Judgment reversed with direction. Blackburn, C. J., concurs. Ruffin, Miller and Phipps, JJ., concur and concur specially. Pope, P. J., Andrews, P. J., Johnson, P. J., Smith, P. J., and Ellington, J., concur in Division 3 and concur specially. Eldridge and Mikell, JJ., dissent.*

RUFFIN, Judge, concurring specially.

I concur with the majority opinion. I write separately to elaborate on my views of (1) why *Watson v. State*[1] should be revisited and overruled, and (2) why the dissent's analysis of the officer's investigation is flawed. The inquiry is, as defined by the United States Supreme Court in *Terry v. Ohio*,[2] "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

1. Were the officers' actions in this case and in *Watson* justified at their inception?

The relevant facts in *Watson* are identical to the facts in this case. There, as here, an officer conducted a brief investigative stop of an automobile after noticing that the vehicle displayed drive-out tags. In this case, as in *Watson*, the officer justified the stop based upon his experience that many cars with drive-out tags are stolen.[3] In *Watson*, we found that this constituted an "objective manifestation that the persons stopped may be engaged in criminal activity" and therefore concluded that the stop was authorized.[4]

Both the majority and dissent in this case begin their inquiry on common ground. It is undisputed that such stops implicate the Fourth Amendment proscription against unreasonable searches and seizures.[5] We also agree that because the detention was not supported by probable cause, the stop must have been "justified by specific and articulable facts which, taken together with rational infer-

---

[1] 190 Ga. App. 696 (379 SE2d 817) (1989).
[2] 392 U. S. 1, 20 (88 SC 1868, 20 LE2d 889) (1968). See also *United States v. Sharpe*, 470 U. S. 675 (105 SC 1568, 84 LE2d 605) (1985).
[3] *Watson*, supra, 190 Ga. App. 696.
[4] (Citations and punctuation omitted.) Id. at 696-697.
[5] See *Delaware v. Prouse*, 440 U. S. 648, 653 (99 SC 1391, 59 LE2d 660) (1979).

ences from those facts, reasonably warrant [the] intrusion."[6]

The facts here, and in *Watson*, did not warrant such intrusion. The videotape in this case shows that it was the mere presence of the drive-out tag on Berry's car, coupled with the officer's experience that "a lot of times" these tags appear on stolen vehicles, that precipitated the stop. Thus, the officer decided to "run a quick check" on Berry's license "to make sure everything [was] alright," and he called in the vehicle identification number (VIN) on the car.[7]

There is no evidence of record which indicates whether the officer in this case and his department have a policy of stopping all cars displaying temporary tags or whether they merely spot check such cars to determine whether they are stolen. Both scenarios are troubling. Assuming the officer stops all such cars, I question how many cars he must stop to find one stolen car. Aside from the officer's statement that temporary tags appear on stolen cars "a lot of times," there is no evidence indicating the rate of incidence. However, common sense dictates that the percentage of stolen cars on the road displaying temporary tags is very small and that the number of vehicles displaying temporary tags which will be stopped in order to find one stolen vehicle will be, in comparison, very large.[8] Under these circumstances, the contribution to crime prevention will be marginal at best.[9]

The second scenario presented above, that the officer and his department merely spot check cars displaying temporary tags to determine whether they are stolen, is equally disturbing. There is nothing indicating how the officer would decide which cars to stop, and the United States Supreme Court has counseled against the "grave danger" and "evil" presented by "[t]his kind of standardless and unconstrained discretion."[10]

Although I do not dispute that states have a legitimate interest in preventing car theft, that alone is insufficient to justify the intrusion at issue. "[T]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."[11] The hypothesis at work under both scenarios presented above is that "stopping apparently [compliant] drivers is

---

[6] (Punctuation omitted.) *McSwain v. State*, 240 Ga. App. 60, 61 (522 SE2d 553) (1999) (quoting *Terry*, supra, 392 U. S. at 21).

[7] Of course, the officer's investigation went far beyond this documentation check. I address the issues raised by his other conduct in Division 2 of this special concurrence.

[8] See *Prouse*, supra, 440 U. S. at 659-660 (considering the marginal contribution of stopping all drivers to find only one unlicensed driver).

[9] See id.

[10] Id. at 661-662.

[11] Id. at 653-654.

necessary only because the danger presented by some drivers is not observable at the time of the stop."[12] That hypothesis did not survive the United States Supreme Court's balancing test in *Delaware v. Prouse*,[13] and I can discern no reason why it should survive here. Indeed, this Court has previously held that such stop is impermissible,[14] and my research of cases from several jurisdictions did not reveal a single court which upheld a stop under the circumstances.[15]

For these reasons, I agree with the majority that *Watson* should be overruled and agree with Presiding Judge Pope that *Burtts v. State*[16] should be overruled.[17] I disagree with the dissent that the officer was justified in stopping Berry. Probable cause is not satisfied by a policeman's proclivity to pry.

2. Were the officers' actions in this case reasonably related in scope to the circumstances which justified the interference in the first place? The majority answers with a nonnegotiable "no." The dissent, with equal passion responds with a dubious "yes." For reasons which follow, I cannot enter that door of doubt with the dissent.

In light of my conclusion in Division 1 that the stop was not justified at its inception, I would usually dispense with considering whether the scope of the officers' investigation was impermissibly broad. However, because I believe the dissent has misconstrued *Terry* and its progeny, and because it recommends overruling *Smith v. State*,[18] I believe it is necessary to comment on these matters.

In *Terry*, the Court addressed the constitutionality of an investigative stop and recognized that "the scope of the particular intrusion, in light of all the exigencies of the case, [is] a central element in the

---

[12] Id. at 661.

[13] See id.

[14] See *State v. Aguirre*, 229 Ga. App. 736 (494 SE2d 576) (1997).

[15] See, e.g., *United States v. Wilson*, 205 F3d 720 (4th Cir. 2000); *State v. Butler*, 343 S.C. 198 (539 SE2d 414) (App. 2000); *State v. Childs*, 242 Neb. 426 (495 NW2d 475) (1993); *State v. Chatton*, 11 Ohio St.3d 59 (463 NE2d 1237) (1984).

[16] 211 Ga. App. 840 (440 SE2d 727) (1994).

[17] According to a study conducted by the National Insurance Crime Bureau (NICB), a not-for-profit insurance organization committed to combating vehicle theft and insurance fraud, the ten most commonly stolen vehicles in the United States in 1999 were: 1. Honda Accord, 2. Toyota Camry, 3. Oldsmobile Cutlass, 4. Chevrolet full-size pickup, 5. Honda Civic, 6. Toyota Corolla, 7. Jeep Cherokee, 8. Chevrolet Caprice, 9. Ford Taurus, 10. Chevrolet Cavalier. See NICB, Top Stolen Cars (November 14, 2000), http://www.nicb.org/services/top_stolen_cars.html. If we continue to subscribe to the law established by *Watson* and *Burtts*, and relied upon by the dissent here, perhaps retailers of these top-ten stolen cars should include a disclaimer on the window sticker providing that "any person observed driving the vehicle may be detained by police at any time because this model car is stolen a lot of times." Seemingly absurd, under *Watson* and *Burtts* an officer could stop a person driving one of these cars based upon his specific knowledge that the particular car is often stolen. See *Watson*, supra.

[18] 216 Ga. App. 453 (454 SE2d 635) (1995).

analysis of reasonableness."[19] Indeed, the Court advised that "[t]he scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible."[20] Thus, the Court framed the inquiry as "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[21]

Fifteen years after its decision in *Terry*, the Court, with no less fervor, continued to circumscribe the scope of warrantless searches in *Florida v. Royer*.[22] In *Royer*, the Court reiterated that "the search must be limited in scope to that which is justified by the particular purposes served by the exception."[23] In other words, the Court explained, "[t]he scope of the detention must be carefully tailored to its underlying justification."[24] Although the "scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case," the Court in *Royer* made it clear that

> an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.[25]

Based on these principles, this Court found the stop in *Smith v. State*[26] was impermissibly broad. In *Smith*, the officer stopped the defendant, Smith, to investigate why his car was weaving. Upon being satisfied that Smith was not driving under the influence of alcohol, the officer probed into whether Smith possessed any narcotics. We held that "[a]t the point the officer initiated this later probe, he went beyond the permissible scope of the investigation and his further detention of Smith went beyond that permitted by *Terry* and its progeny."[27] The reasons underlying our decision are clearly supported by *Terry* and its progeny. The scope of the officer's detention was not carefully tailored to investigate why Smith was weaving. The *investigative methods* used, interrogating Smith about whether he possessed drugs, were totally unrelated to his driving and could not

---

[19] *Terry*, supra, 392 U. S. at 19, n. 15.
[20] Id.
[21] Id. at 20.
[22] 460 U. S. 491 (103 SC 1319, 75 LE2d 229) (1983).
[23] Id. at 500.
[24] Id.
[25] Id.
[26] Supra, 216 Ga. App. at 454-455.
[27] Id. at 455.

confirm or dispel the officer's suspicion that Smith was driving under the influence of alcohol. Likewise, the *period* of detention was unnecessarily long because the officer delved into these other matters.

The circumstances in the instant case are even more compelling. The officer had no reason to stop Berry in the first place. Moreover, the officer's investigative method was not the "least intrusive means reasonably available to verify or dispel [his] suspicion" that the car was stolen, and Berry's detention lasted "longer than [was] necessary" to determine whether the car was stolen.[28]

The video reveals that the officer focused his investigation on virtually everything except whether the car was stolen. The officer took Berry's driver's license at the beginning of the stop and proceeded to ask him questions about where he came from, the weather, and Berry's son. The officer displayed particular interest in Berry's son, investigating where he lived, whether he was sick, his age, whether he was in school or working, and whether he had ever been in any trouble. It is not until *after* the officer interrogated Berry on all these unrelated personal matters, that the officer even bothered to copy the VIN on the suspected stolen vehicle and call it in, a task that took only 35 seconds. And, after completing this brief task directed toward determining whether the car was stolen, the officer resumed his totally unrelated interrogation into Berry's private life, now focusing his investigative efforts on searching Berry's personal belongings. The invective of the dissent notwithstanding, we judges should be able to distinguish between the particular and the peculiar.

If the officer had a reasonable, articulable suspicion that the car was stolen, his investigative methods should have been tailored to verify or dispel his suspicion. Interrogation about Berry's family matters and travel itinerary, even if seemingly benign to the casual observer, constituted a substantial and unnecessary intrusion into Berry's personal security. Berry was not free to leave, and there is nothing indicating that his participation in this interrogation was consensual. Had the officer "diligently pursue[d] [his] investigation"[29] into whether the car was stolen, and limited his investigation into that matter, the detention would have been brief, and Berry would have been spared the unnecessary intrusion into his personal affairs. *Terry* is instructive:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all

---

[28] *Royer*, supra, 460 U. S. at 500.
[29] *Sharpe*, supra, 470 U. S. at 685.

restraint or interference of others, unless by clear and unquestionable authority of law.[30]

The officer had no such authority in this case. An unlawful arrest is the contraband of liberty. To curtail our liberty is to steal our liberty, and to steal our liberty is to steal our future as well as our freedom. Accordingly, I concur with the majority.

I am authorized to state that Judge Miller and Judge Phipps join in this special concurrence.

POPE, Presiding Judge, concurring specially.

I concur in Division 3 of the majority opinion, that the initial traffic stop was not valid, but would limit the opinion to that topic because it controls the outcome of the case.

I disagree with the dissent's statement that no question regarding the propriety of the initial stop is before us. Berry moved to suppress, in part, on the grounds that "[t]he police had no articulable suspicion for the stop." The trial court ruled on this issue stating that the stop was valid because Berry "did not have a state-issued tag." The principle underlying waiver of an argument is that the movant may have waived an argument if he has not given the court an opportunity to rule on the issue. See *Morgan v. Kiff*, 230 Ga. 277 (196 SE2d 445) (1973), overruled on separate grounds, *Jacobs v. Hopper*, 238 Ga. 461, 463 (233 SE2d 169) (1977). Because the trial court did in fact rule on the issue, it clearly had the opportunity. Berry enumerated as error the trial court's denial of the motion to suppress. And the validity of the initial stop is part of the analysis of whether an officer's subsequent questioning and detention are justified. *United States v. Sharpe*, 470 U. S. 675, 682 (105 SC 1568, 84 LE2d 605) (1985); *Smith v. State*, 216 Ga. App. 453, 454 (454 SE2d 635) (1995).

I fully concur in the majority opinion's conclusion that the initial stop was not valid under the Fourth Amendment. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." A traffic stop is reasonable where the police have "probable cause to believe that a traffic violation has occurred," *Whren v. United States*, 517 U. S. 806 (116 SC 1769, 135 LE2d 89) (1996), or reasonable suspicion that the car's occupants are involved in criminal activity. *United States v. Hensley*, 469 U. S. 221 (105 SC 675, 83 LE2d 604) (1985). Here, the arresting officer had neither.

*Delaware v. Prouse*, 440 U. S. 648 (99 SC 1391, 59 LE2d 660) (1979), is instructive. There, the Supreme Court declared unconstitutional random stops of individual cars for the purposes of checking

---

[30] (Punctuation omitted.) *Terry*, supra, 392 U. S. at 9.

the driver's license and the car's registration, holding:

> except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.

Id. at 663. The same reasoning applies here. A South Carolina dealer tag, which is not required to show the expiration date, standing alone, does not provide an articulable suspicion that the tag has expired. *State v. Butler*, 343 S.C. 198, 201-206 (539 SE2d 414, 416-418) (App. 2000). And, there is no testimony in the record in this case about the tag to suggest that it was not validly and properly displayed or that it looked old, torn, or faded.

Relying on *Prouse*, the South Carolina Court of Appeals held that the Fourth Amendment prohibited South Carolina officers from stopping cars solely on the basis of having a South Carolina dealer tag. Id. As stated in *Butler*: "We cannot sanction the random stop of any and every car bearing a temporary tag, leaving in the hands of law enforcement officers the freedom to detain whomever they desire without having to justify why they chose to stop one motorist over another." *Butler*, 343 S.C. at 204.[31] Two other states have reached similar results. See *State v. Childs*, 242 Neb. 426 (495 NW2d 475) (1993); *State v. Chatton*, 11 Ohio St.3d 59 (463 NE2d 1237) (1984).

Similarly, the officer's knowledge that dealer tags are sometimes used by car thieves on stolen cars is not reasonable suspicion that Berry was driving a stolen car. Thieves sometimes steal cars with regular license plates on them, but no one would suggest it would be permissible to allow the police to stop every car with a legitimate license plate in order to check to see whether the car may have been stolen.

However, having determined that the stop was invalid, we need go no further. If the initial stop is invalid, none of the fruits of the stop are admissible. Accord *State v. Jones*, 214 Ga. App. 593 (448 SE2d 496) (1994). We need not reach the question of whether the continued detention and investigation were warranted.

Lastly, I would note that in addition to *Watson v. State*, 190 Ga. App. 696 (379 SE2d 817) (1989), it is also necessary to overrule

---

[31] The fact that under South Carolina law no expiration date need be shown on the tag makes *Butler* more applicable to our decision, not less so.

*Burtts v. State*, 211 Ga. App. 840 (440 SE2d 727) (1994), to the extent that it authorizes stops on this basis alone.

I am authorized to state that Presiding Judge Andrews, Presiding Judge Johnson, Presiding Judge Smith, and Judge Ellington join in this special concurrence.

ELDRIDGE, Judge, dissenting.

The uncontested initial stop was valid; the valid stop was ongoing and was not prolonged in order to conduct the free-air K-9 search; and the free-air K-9 search did not violate the Fourth Amendment. So, I respectfully dissent.

1. The propriety of the initial stop based on an invalid license tag is not before us, because the issue went undisputed in the court below.[32] The trial court's finding that "the officer lawfully stopped the vehicle driven by the defendant because the vehicle did not have a state-issued tag" provides nothing for this Court to review when no one ever claimed below that such stop was *not* lawful. There is no issue when nobody argues one. Thus, the State did not get to put forward any grounds to uphold a stop based on the failure to display a valid tag, and the trial court did not get to rule on such issue. To base a reversal on a trial court's specific ruling that was neither challenged below nor enumerated as error before this Court is, in my view, to violate a basic principle of appellate review. I continue to maintain that resolution of our cases based upon issues that were not in dispute below and thus not addressed by the State or the trial court is fundamentally unfair.[33] While we have under certain circumstances reached issues unaddressed by either party in order to *affirm* a judgment as right for any reason, it does not follow that undisputed issues should be reached in order to find a trial court wrong for any reason.

(a) The trial court found that the uncontested initial stop was valid. As such finding is supported by the facts and the law, it is entitled to our deference.

The officer in this case testified that he stopped Berry's car because "[t]he vehicle did not have a valid tag on it." The officer testified that he could not determine from the face of the South Carolina drive-out tag whether it had expired or not:

> [Defense Counsel:] Drive-out tags are valid in Georgia, correct?
> [Officer:] Up to a certain point.

[32] *Barber v. State*, 236 Ga. App. 294, 297, fn. 1 (512 SE2d 48) (1999) (defendant waived issue raised in written motion by not addressing it at hearing); *Roberson v. State*, 228 Ga. App. 416, 420 (3) (491 SE2d 864) (1997).

[33] *State v. Blackwell*, 245 Ga. App. 135, 148 (2) (b) (iii) (537 SE2d 457) (2000) (Eldridge, J., dissenting).

[Defense Counsel:] And at that time you didn't know whether he was within that period of time or not?
[Officer:] Exactly.

The videotape supports this testimony, and it is undisputed the South Carolina paper drive-out tag did not display any dates. Thus, this is a proper basis for a stop in Georgia because here we have a comprehensive statutory scheme governing the registration of vehicles, making it a misdemeanor to operate a newly acquired vehicle without a valid license plate, and providing specific statutory authority for enforcement of these laws.

OCGA § 40-2-20 (a) (1)[34] states that every person must register and obtain a license plate for a new or used vehicle within 30 days of its purchase, and "[a]ny person who fails to register a new or used motor vehicle within 30 days of its purchase as required in subsection (a) of this Code section shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine not exceeding $100."[35] And OCGA § 40-2-8 (b) (2) (A)[36] states that

> [i]t shall be a misdemeanor to *operate* any vehicle required to be registered in the State of Georgia without a valid numbered license plate properly validated[;] provided, [however], that the purchaser of a new vehicle or a used vehicle may operate such vehicle on the public highways and streets of this state without a current valid license plate during the period within which the purchaser is required . . . to register such vehicle.

(Emphasis supplied.)

In order to enforce such laws, our statutory scheme specifically provides that the operation of a newly acquired vehicle not bearing a valid Georgia plate is a misdemeanor, and the operator must prove upon request that the vehicle falls within the 30-day registration period, in which case the operator is exempt from the penalties for such misdemeanor:

> The purchaser and operator of a vehicle shall not be subject to the penalties set forth in this Code section during the period allowed for the registration. *If the owner of such vehicle presents evidence that such owner has properly applied*

---

[34] As reflected in Ga. L. 1998, p. 1182, § 4, applicable to the instant case.
[35] OCGA § 40-2-20 (c).
[36] OCGA § 40-2-8 as reflected in Ga. L. 1998, p. 1181, § 3, as applicable to the instant case, was significantly amended in Ga. L. 2000, p. 523, § 1, to provide for mandatory temporary licensing which displays the expiration date of the temporary licensing period.

*for the registration of such vehicle, but that the license plate or revalidation decal has not been delivered to such owner, then the owner shall not be subject to the above penalties.*[37]

Thus, to enforce our registration laws, this Code section gives an officer the specific authority to check whether a paper temporary tag without an expiration date — or a vehicle driven with no tag at all — is in compliance with our laws, and it puts the burden on the driver of such newly acquired vehicle to "present evidence" of compliance in order to avoid the penalty.

In this case, it was impossible for the officer to know if Berry's vehicle was in compliance with OCGA §§ 40-2-20 and 40-2-8 without effectuating a stop. The South Carolina paper temporary tag bore no markings so as to show compliance with registration laws. The officer had specific statutory authority to inquire and ask Berry to demonstrate compliance with registration laws. Clearly, it cannot be argued that the fact the tag was out-of-state somehow exempted it from Georgia law. If that was the case, the convenient attachment to *any* vehicle of an out-of-state drive-out tag could frustrate enforcement of OCGA §§ 40-2-20 and 40-2-8.[38]

Reliance on *State v. Butler*[39] is misplaced because South Carolina (as well as the two other states whose cases are cited by the special concurrence) does not have Georgia's statutory scheme which specifically permits an officer to inquire into the validity of temporary tags and to ask an operator to "present evidence" that the operator has properly applied for a license plate.

Simply as a matter of common sense, the Georgia General Assembly would not have enacted our detailed laws, with (1) criminal penalties attached for failure to comply, and (2) the provision that upon inquiry the operator of a newly acquired vehicle must present evidence of compliance, if that body had not intended to have the laws enforced.[40]

It must be recognized that whether the above law is applied uniformly or not is not before us. Likewise, the constitutionality of this statutory scheme is not before us. What is before us is the fact that the statute authorizes the steps that occurred in the instant case. Here, the trial court found that the initial stop was proper because Berry did not have a valid license tag. Berry's South Carolina temporary dealer's drive-out paper tag did not display any markings to

---

[37] (Emphasis supplied.) OCGA § 40-2-8 (b) (3).

[38] *Jordan v. State*, 223 Ga. App. 176, 177 (1) (477 SE2d 583) (1996).

[39] 343 S.C. 198 (539 SE2d 414) (App. 2000).

[40] Compare Ga. L. 1980, p. 746, and Ga. L. 1981, p. 716, § 4. See also Ga. L. 1993, p. 1260, amending OCGA § 40-2-8 "so as to require Georgia residents to maintain proof of vehicle registration in such motor vehicle at all times."

demonstrate it was a "valid tag" in compliance with Georgia law, and the officer had specific statutory authority to ask the operator to "present evidence" that such newly acquired vehicle was in compliance with Georgia law. Thus, the initial stop was proper, and reversal on this ground is not warranted.[41]

(b) *State v. Butler* and the two states whose cases have been cited by the special concurrence have completely different statutory provisions which do not provide specific statutory authority for an officer's enforcement of state registration laws. Thus, these foreign cases have no application to the instant case and provide no basis for overruling our prior decision in *Burtts v. State*, as urged by the special concurrence.

(c) Likewise, *Watson v. State*[42] has no application to this case and should not be overruled herein, as urged by the majority. Berry's car was not stopped because drive-out tags are often used to conceal stolen vehicles. The officer developed such suspicions *after* the proper stop, when he saw that Berry's rental contract and the drive-out tag were issued by different companies. The instant case provides the wrong venue to overrule *Watson*, and *Watson* provides the wrong vehicle to reverse the instant case.

2. The trial court found that the valid stop was ongoing during the free-air K-9 search and the valid stop was not prolonged in order to conduct the search. Such finding, supported by evidence, should be upheld.

Georgia State Patrol Officer Morgan testified that in order to determine if the paper tag was valid, he checked Berry's rental contract. He called in the vehicle identification number (VIN) on Berry's car when the rental contract stated that the vehicle was from "Robert's Rental," but the paper drive-out tag stated that the vehicle was from "Hartsog's Rental." Such conflict, coupled with the officer's knowledge that drive-out tags are commonly used to conceal auto theft, provided reasonable articulable suspicion to briefly detain Berry for a VIN check of his rented vehicle.[43]

Thereafter, while the officer and Berry were waiting for information on the VIN check, the on-the-scene K-9 performed the free air search of the car. Berry did not testify or offer any evidence to contradict this fact.

Contrary to the cases cited by the majority wherein the traffic stop investigation at issue had *clearly* been completed and the defendant was unlawfully detained further,[44] the traffic investigation

---

[41] *Burtts v. State*, 211 Ga. App. 840 (440 SE2d 727) (1994).

[42] 190 Ga. App. 696 (379 SE2d 817) (1989).

[43] *Terry v. Ohio*, 392 U. S. 1, 21 (88 SC 1868, 20 LE2d 889) (1968).

[44] Compare *State v. Blair*, 239 Ga. App. 340, 341 (521 SE2d 380) (1999); *Migliore v.*

in this case was clearly ongoing; only two minutes had elapsed between the call-in of the rental car's VIN at 10:10 a.m. and the free air search by the drug dog at 10:12 a.m.; and the free air search did not prolong the lawful detention.

The majority claims reversal is warranted because of a comment on the videotape by Officer Morgan to Berry that if the drug dog did not "hit" on anything, the officer would "send you on your way." From this "send you on your way" comment — made in order to placate what the videotape shows and the trial court found was an obviously unnerved Berry — the majority infers that the officer "abandoned" the VIN check.

However, Berry did not offer evidence or ever contend that the officer abandoned the VIN check. And Officer Morgan testified at both the preliminary hearing and at the hearing on the motion to suppress that Berry was not free to leave until the VIN information came back on the radio:

> [Defense Counsel:] Now, Officer Morgan, do you remember appearing at a committal hearing on October 6th here in Rockdale County Magistrate Court with me and Mr. Berry? . . . Do you remember telling me that you were not going to let Mr. Berry go until you got the information back over the VIN check?
> [Officer:] Yes.

Moreover, in the videotape the officer specifically told Berry that he needed to check the VIN because it is so easy to remove a paper drive-out tag like the one on Berry's vehicle, go to an auto lot, put the paper tag on another vehicle, and drive the car away.

From this evidence, it would seem unreasonable to infer that Officer Morgan no longer cared what the VIN check would show and had abandoned his investigation of whether the rental car was stolen. While the majority finds that

> [a] significant discrepancy exists between the officer's testimony that he had not completed his investigation of the drive-out tag when he conducted the search with his dog and his statement on the videotape that Berry would be free to go after the dog checked his car,[45]

---

*State of Ga.*, 240 Ga. App. 783, 786 (525 SE2d 166) (1999); *Simmons v. State*, 223 Ga. App. 781-782 (479 SE2d 123) (1996); see also *State v. Kwiatkowski*, 238 Ga. App. 390 (519 SE2d 43) (1999).

[45] The officer never told Berry that he "would be free to go after the dog checked his car."

this Court has repeatedly held,

> [i]t was the duty of the trial court to resolve all of these discrepancies in evidence and determine the credibility of the witnesses. On appeal of the denial of a motion to suppress, the evidence is to be construed most favorably to the upholding of the findings and judgments made.[46]

And it may be true, as the majority posits, that findings of fact which specifically conflict with facts recorded on videotape should give way to the videotape. But to me, it would be a true mistake to extend this objective principle by holding — as the majority opinion suggests — that an officer's *subjective* thought processes later testified to at a suppression hearing must be articulated on the videotape or a "conflict" between tape and testimony ensues, and the tape prevails. Instead,

> on these issues, the trial court's ruling was in part dependent upon [the officer's] credibility and the weight the trial court put upon the evidence. We must therefore defer to the findings of the trial court, as issues of disputed fact, the veracity of a witness, and the weight of the evidence are within its province.[47]

In this case, the trial court resolved any discrepancies and specifically found that at the time of the search the "traffic stop was ongoing in the matter and the Defendant had not been given permission to leave." The free air search by the K-9 was conducted and completed within two minutes of the officer's VIN call-in and while both the officer and Berry were clearly waiting for a reply thereto. As such, the valid traffic stop was not prolonged, and there was no detention other than that which encompassed the proper stop.[48]

3. The free air K-9 search did not violate the Fourth Amendment. The Fourth Amendment is not offended by requesting consent to search a vehicle for drugs during the course of a valid traffic stop, as was done in this case.[49] "Having already effected a valid stop of the vehicle, the trooper certainly did not violate the appellant['s] Fourth Amendment rights merely by requesting such consent. Accord *Schneckloth v. Bustamonte*, 412 U. S. 218 (93 SC 2041, 36 LE2d 854) (1972)."[50] Likewise, a drug enforcement K-9 has a right to be on the

---

[46] *Moon v. State*, 194 Ga. App. 777 (1) (392 SE2d 19) (1990).

[47] *Lyons v. State*, 244 Ga. App. 658, 661 (535 SE2d 841) (2000).

[48] *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994).

[49] *Kan v. State*, 199 Ga. App. 170, 171 (1), (2) (404 SE2d 281) (1991).

[50] *Pupo v. State*, 187 Ga. App. 765, 766 (2) (371 SE2d 219) (1988); accord *Taylor v. State*,

public roadway, and a driver has no reasonable expectation of privacy in the airspace surrounding his car: "exposure . . . in a public place, to a trained canine [does] not constitute a 'search' within the meaning of the Fourth Amendment."[51] Thus, during the course of a valid traffic stop, a free air search, which does not prolong a legitimate detention, does not violate the Fourth Amendment: "police could have conducted the free-air search while the officer was issuing warnings for the traffic offenses."[52]

Further, this Court's holding in *Smith v. State*[53] is not applicable in this case, since the brief traffic stop was ongoing and was in no way prolonged in order to conduct the free air K-9 search.[54]

Moreover, with regard to *Smith v. State*, such case was wrongly decided to the extent that it holds — as the special concurrence urges — mere questioning on an unrelated topic constitutes a violation of *Terry*. As the Eleventh Circuit held this year:

> a police officer's questioning, even on a subject unrelated to the purpose of the stop, is not itself a Fourth Amendment violation. Mere questioning is neither a search nor a seizure. . . . [T]he issue regarding unrelated questions concerns not the content of the questions, but their impact on the duration of the stop. . . . Therefore, only unrelated questions which *unreasonably* prolong the detention are unlawful; detention, not questioning, is the evil at which *Terry*'s prohibition is aimed. Questions which do not extend the duration of the initial seizure do not exceed the scope of an otherwise constitutional . . . stop.[55]

In this case, Berry's motion to suppress was properly denied, and the judgment of the court below should be affirmed.

I am authorized to state that Judge Mikell joins in this dissent.

---

230 Ga. App. 749, 751 (1) (c) (498 SE2d 113) (1998).

   [51] *United States v. Place*, 462 U. S. 696, 706-707 (103 SC 2637, 77 LE2d 110) (1983); *O'Keefe v. State*, 189 Ga. App. 519, 526 (376 SE2d 406) (1988); *Boggs v. State*, 194 Ga. App. 264-265 (390 SE2d 423) (1990); *State v. Hall*, 235 Ga. App. 412, 415 (509 SE2d 701) (1998).

   [52] *State v. Jones*, 245 Ga. App. 763, 767 (538 SE2d 819) (2000).

   [53] 216 Ga. App. 453, 454 (454 SE2d 635) (1995).

   [54] Notably, the officer's questions relating to "personal matters" that concern the special concurrence were asked while the officer was "killing time" waiting for the driver's license information to come back over the radio and did not prolong the detention. Berry answered willingly, and the video shows the exchange was agreeable to both parties.

   [55] (Citations and punctuation omitted; emphasis supplied.) *United States v. Purcell*, 236 F3d 1274, 1279-1280 (11th Cir. 2001).

DECIDED MARCH 30, 2001.

*James S. Purvis*, for appellant.
*Richard R. Read, District Attorney, Heather C. Waters, Dabney Y. Kentner, Assistant District Attorneys*, for appellee.