## A06A1298. TANNER v. THE STATE.
(635 SE2d 388)

BARNES, Judge.

Juan Tanner appeals from his conviction following a bench trial for trafficking in cocaine, contending that the trial court erred in denying his motion to suppress. He argues that his detention at a traffic stop was unreasonably prolonged without a reasonable articulable suspicion of criminal activity. For the reasons that follow, we affirm.

In considering the denial of a motion to suppress, we construe the evidence in the light most favorable to the trial court's judgment, and its findings of fact based on conflicting evidence must be accepted unless clearly erroneous. *Woodward v. State*, 245 Ga. App. 409 (537 SE2d 791) (2000).

So construed and as found by the trial court, a Habersham County deputy sheriff stopped Tanner at 2:46 a.m. for driving 84 miles per hour in a 65 mile-per-hour zone, calling in the tag number as he pulled the car over. When the deputy approached the car, he smelled a strong odor of alcohol and saw an open beer can in the car's center cupholder. He asked Tanner for his license and proof of insurance, but Tanner give him his license and a rental car contract. The deputy then returned to his patrol car, and called in the license information and for a backup, per his usual procedure.

The deputy returned to Tanner's vehicle, noticed the beer can was gone, and asked Tanner to step out of the car, at which point he patted him down for weapons and found none. He asked Tanner if he had been drinking, and Tanner responded that he not been but admitted that he had moved the open beer can the deputy had seen earlier. The deputy asked if he could search the vehicle, but Tanner declined, explaining that it was a rental. He became defensive, backed up against the car, and was very nervous.

Tanner explained that the rental contract was in his mother's name, but he was listed as a permissible driver, and that she had called the rental company to obtain oral permission to extend the rental period for three days. The deputy testified that drug couriers often used cars rented in a third party's name, so he returned to his patrol car and asked the dispatch operator to try to contact the rental company to verify Tanner's story. It took 30 minutes for dispatch to inform the deputy that the car had not been reported stolen, and it took about 20 to 25 minutes for dispatch to return information about Tanner's license.

Meanwhile, the deputy conducted field sobriety tests because of the alcohol odor and the open can. Although Tanner failed two of the

tests, his alco-sensor test was negative. During this time, the backup officer arrived and stood near the passenger door to keep an eye on the passenger.

At 3:05 a.m., about 20 minutes into the stop, the deputy contacted a K-9 operator to bring his dog to the scene. He had written no tickets, and had not yet heard back from dispatch regarding the status of Tanner's license or whether the car had been reported stolen. He also had not completed his open container investigation, having not yet located the beer can, and his backup officer had spotted an apparent open bottle of liquor in plain view, protruding from beneath the back of the passenger seat. The deputy called for the drug dog because the rental agreement had expired; because Tanner was nervous and backed up against the car while declining consent to search; and because Tanner had admitted having the open container, which made the officer think that Tanner was trying to hide something else by admitting to the open container as a diversion. While waiting for the K-9 unit, the deputy began to write a ticket, planning to cite Tanner for speeding. He also intended to arrest Tanner for the open container, but had not yet located the container and was waiting for the drug dog to arrive. The dog and her handler arrived at 3:27 a.m., about 15 minutes after the deputy finished writing the speeding ticket and about 40 minutes after the stop began. At that time, dispatch had reported back to the deputy that the car had not been reported stolen and that Tanner's license was good, but dispatch had not yet reported back about its attempt to contact the rental car company to confirm that the rental period had been extended.

The K-9 officer and the drug dog circled Tanner's vehicle twice, and the handler reported that the dog "showed interest" both times at the passenger door, which the handler reported to the officer as an alert. The handler explained that, while the dog did not actively alert by barking, jumping, or scratching, the minute changes in the dog's body language, breathing, tail wagging, and ears, along with the fact that she turned her head further toward the car as they passed, told him that she smelled drugs. While to the untrained eye, the dog did not appear to alert, the handler saw and interpreted these changes as an alert based on his familiarity with the dog, which he had bought with his own money as a puppy and had trained. The handler also testified that every time the dog had ever shown interest in this way, he had either found narcotics or a subsequent investigation detected a high probability that contraband had previously been located in that location. The officer informed Tanner that the dog had alerted at the passenger door and asked if he knew why; Tanner said he did not know, but the passenger might have a bag of marijuana on her. The passenger exited the car at the deputy's request, and Tanner told her to give the deputy the bag of marijuana in her pocket, which she did.

The passenger was placed under arrest, and the officers searched the car. They found a beer can under the driver's seat, an open gin bottle under the passenger seat, and 70.32 grams of cocaine and digital scales in the glove compartment. The passenger's purse, which was located between the two front seats, contained a loaded 9 mm handgun.

1. Tanner contends that the trial court erred in denying his motion to suppress, arguing that his prolonged detention at the traffic stop was not justified by a reasonable, articulable suspicion of criminal wrongdoing.

> An officer must have reasonable suspicion of criminal conduct before conducting additional questioning and searching a vehicle once a normal traffic stop has ended and the officer has told the motorists they are free to go. To meet the reasonable suspicion standard, an officer's investigation during a traffic stop must be justified by specific, articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct. Although this suspicion need not meet the standard of probable cause, it must be more than mere caprice or a hunch or an inclination.

(Citation and punctuation omitted.) *Berry v. State*, 248 Ga. App. 874, 881-882 (4) (547 SE2d 664) (2001).

Tanner does not challenge his initial stop for speeding. As the deputy sheriff observed him violating the traffic laws by speeding, he had probable cause to stop him and investigate the incident. *Mallarino v. State*, 190 Ga. App. 398, 400 (2) (379 SE2d 210) (1989). He contends instead that the officer's detention should have ended when he determined that Tanner was not driving under the influence and that the car had not been reported stolen. Tanner's citations in his brief to the deputy's testimony do not establish when the deputy learned that the car had not been reported stolen, only that he knew it was not stolen by the time he impounded the car. In fact, the deputy testified in response to Tanner's cross-examination that it took about 30 minutes for dispatch to inform him that the car was not stolen, and at that time, the deputy was still investigating the open container violation. Further, "[g]iven that the rental agreement had, in fact, expired, [the deputy] had an objective reason for believing that [Tanner] may have been engaged in criminal conduct." *Crenshaw v. State*, 248 Ga. App. 505, 510 (4) (546 SE2d 890) (2001).

Tanner then argues that the deputy should have proceeded to arrest Tanner on the open container violation when he first saw the beer can, instead of continuing his investigation, which Tanner contends was just an excuse for waiting until the drug dog arrived. If

the deputy had arrested him for the open container, Tanner asserts, he could have searched only the passenger compartment of the vehicle, and thus he would not have discovered the cocaine in the glove compartment. The case Tanner cites does not address whether an arresting officer could search the trunk or glove compartment of a vehicle incident to an arrest; it merely states that, in addition to being able to perform an inventory search on a vehicle being impounded, the search of the passenger compartment in that case was also permissible incident to the defendant's arrest. *Fortson v. State*, 201 Ga. App. 272, 274-275 (2) (410 SE2d 774) (1991).

The deputy testified that he had always planned to arrest Tanner for the open container violation, and that he eventually wrote a citation for that crime about an hour after the initial stop as the wrecker arrived to tow the car. Whether the deputy arrested Tanner for that violation when he first stopped him, or after he determined the car was not reported stolen, or after the drug dog arrived does not change the analysis. The car still would have been searched, whether for an inventory or incident to his arrest. *Fortson*, supra, 201 Ga. App. at 274-275 (2). Additionally, the open gin bottle under the passenger seat was in plain view, giving the deputy additional probable cause to search the car, as did the fact that the drug dog alerted to the passenger door after she arrived. *Biffle v. State*, 214 Ga. App. 641, 642 (448 SE2d 749) (1994).

Given the deputy's explanation that he called for the drug dog because he did not know whether the car was stolen and because Tanner was nervous, backed toward the car when he declined consent to search, and had confessed to an open container violation, the continued detention was justified by specific and articulable facts. Those facts, taken together with rational inferences from those facts, reasonably warranted the detention, and the trial court was authorized to determine that the detention was neither arbitrary nor harassing. *Vaughn v. State*, 263 Ga. App. 536, 539-540 (588 SE2d 330) (2003).

Further, the deputy waited only about ten minutes for the dog to appear after he received the report from dispatch that the car was not reported stolen, time he would have spent anyway arresting Tanner on the open container violation and searching the car's interior. Thus Tanner was not detained unreasonably by the wait.

Finally, "[w]hen the dog alerted for drugs, that factor, combined with the factors prompting the use of the drug dog in the first instance, established probable cause for [the deputy] to believe [Tanner] was in possession of illegal drugs within his vehicle, authorizing the subsequent search of its interior." *State of Ga. v. Montford*, 217 Ga. App. 339, 341 (1) (457 SE2d 229) (1995). The trial court did not err in denying Tanner's motion to suppress.

2. Tanner also argues that the trial court erred in finding that the drug dog alerted, "disregarding uncontradicted testimony that the dog never alerted" to Tanner's vehicle. To the contrary, the handler testified that the dog alerted when she "showed interest" in the passenger door, although the dog's response was not an active alert. The trial court found this testimony credible and found as a fact that the handler "reported that the dog alerted both times at the passenger door." "Factual and credibility determinations of this sort made by a trial judge after a suppression hearing must be accepted by appellate courts unless such determinations are clearly erroneous." *Johnson v. State*, 233 Ga. 58 (209 SE2d 629) (1974).

*Judgment affirmed. Andrews, P. J., and Bernes, J., concur.*

DECIDED AUGUST 14, 2006.

*Drew W. Powell, Laurie K. Landsittel*, for appellant.
*Michael H. Crawford, District Attorney*, for appellee.