**THIRD DIVISION**
**DOYLE, P. J.,**
**MARKLE and PADGETT, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**December 4, 2025**

# In the Court of Appeals of Georgia

A25A1955. HAMRICK v. THE STATE.

PADGETT, Judge.

William Gerald Hamrick was charged with two counts of driving under the influence of alcohol (OCGA § 40-6-391 (a)(1) and (5)) and one count of failure to maintain lane (OCGA § 40-6-48). Hamrick filed a motion to suppress that was heard by the trial court and initially granted. The trial court then granted the State's motion for reconsideration, and additional evidence was presented relating to Hamrick's motion to suppress.[1] The trial court ultimately vacated the prior order and, in an

---

[1] The trial court found that Hamrick's written motion to suppress failed to put the State on notice of his intent to challenge the blood collection process. Under OCGA § 17-5-30, a written motion to suppress must include sufficient detail to put the State on notice as to the type of search involved, which witnesses to bring to the hearing, and the legal issues to be resolved. *Cochran v. State*, 371 Ga. App. 391, 392 (900 SE2d 213) (2024) (citations omitted).

extremely detailed order, denied the motion to suppress. The trial court also granted an application for immediate review. This Court granted Hamrick's application for interlocutory appeal and this appeal followed.

When considering the denial of a motion to suppress, we view the evidence "in favor of the court's ruling, and we review de novo the trial court's application of the law to undisputed facts." *Snyder v. State*, 374 Ga. App. 417, 417 (913 SE2d 62) (2025) (citation and punctuation omitted). So viewed, the record shows that on March 5, 2023, at approximately 2:30 a.m., Hamrick was driving his vehicle and had a passenger with him. A law enforcement officer observed Hamrick's vehicle fail to maintain its lane of travel and initiated a traffic stop. Upon speaking with Hamrick, the officer noted the smell of alcohol coming from Hamrick and also noted the presence of an open container of alcohol in the center console of the vehicle. The officer had Hamrick step out of the vehicle and during the subsequent conversation, the officer noted the odor of alcohol was coming from Hamrick's breath, that his eyes were bloodshot and watery, and that he had slurred speech. Hamrick eventually consented to participate in field sobriety testing. The officer performed horizontal gaze nystagmus ("HGN") testing, which revealed six clues of impairment. When the

officer began explaining the "walk and turn" test, Hamrick leaned back against the patrol car, sighed heavily, rolled up his sleeves and put his hands behind his back. The officer placed Hamrick under arrest and advised Hamrick of his implied consent warnings. Within the implied consent warnings, the officer requested a blood sample and Hamrick consented.

Back at police headquarters, a certified phlebotomist performed the blood draw with a standard test kit. Testimony revealed that the standard test kit that was used in this incident contained two vials designed for use in connection with a blood draw. The phlebotomist noted that Hamrick was a "hard stick," meaning that she was not able to find a vein from which she could draw blood in the normal antecubital area of the arm, and had to draw blood from Hamrick's hand using a butterfly needle. Although there were two vials in the kit, she only drew enough blood to fill one vial, but that vial was "fairly full."

A forensic toxicologist employed by the Georgia Bureau of Investigation, Division of Forensic Sciences ("DOFS") who tested Hamrick's blood testified at the motion hearing. She confirmed that the evidence sample received by the crime lab only contained one vial of blood taken from Hamrick. The vial contained

approximately five milliliters of blood. The toxicologist testified that she only needs 200 microliters to perform the required testing to determine blood alcohol content and that she received a sufficient sample to perform the testing mandated by the internal procedures established by DOFS. The remainder of the sample collected from Hamrick was returned to cold storage and would be kept for approximately 16 to 18 months after the test results were published.

In a single enumeration of error, Hamrick argues that the test results should be excluded because the phlebotomist did not collect two vials of blood from Hamrick. Hamrick argues that the collection of two vials is mandated by DOFS's existing written policy. The State responded, suggesting that Hamrick "confuses the guidance given by the crime lab to external agencies (e.g. officers, medical examiners, coroners) through its website with the requirements set forth in OCGA § 40-6-392 (a)(1)(A)." (quotation modified). Finding no error, we affirm.

When a defendant challenges the legality of scientific testing conducted in connection with a charge of driving under the influence, the State has the burden of establishing compliance with the mandates set forth in OCGA § 40-6-392. *Ussery v. State*, 366 Ga. App. 379, 379 (883 SE2d 60) (2023). The General Assembly has

established certain statutory mandates that govern the collection and admissibility of evidence in criminal trials relating to allegations of driving under the influence of intoxicants. Id. at 380-81 (citing *Peek v. State*, 272 Ga. 169, 170 (527 SE2d 552)). As is relevant to this case, those statutory mandates appear in OCGA § 40-6-392.

OCGA § 40-6-392(a)(1)(A) addresses the qualifications of the individual who performs chemical analysis of an accused's blood, urine, breath, or other bodily substance. It provides:

> Chemical analysis of the person's blood, urine, breath, or other bodily substance, to be considered valid under this Code section, shall have been performed according to methods approved by the [DOFS] on a machine which was operated with all its electronic and operating components prescribed by its manufacturer properly attached and in good working order and by an individual possessing a valid permit issued by the [DOFS] for this purpose. The [DOFS] shall approve satisfactory techniques or methods to ascertain the qualifications and competence of individuals to conduct analyses and to issue permits, along with requirements for properly operating and maintaining any testing instruments, and to issue certificates certifying that instruments have met those requirements, which certificates and permits shall be subject to termination or revocation at the discretion of the [DOFS].

No portion of that statutory requirement is applicable to individuals who draw the blood samples. That subsection of the statute is directed to the testing of the samples submitted to DOFS. OCGA § 40-6-392(a)(2) addresses the qualifications of the person drawing the blood of the accused. It provides:

> When a person shall undergo a chemical test at the request of a law enforcement officer, only a physician, registered nurse, laboratory technician, emergency medical technician, or other qualified person may withdraw blood for the purpose of determining the alcoholic content therein, provided that this limitation shall not apply to the taking of breath or urine specimens. No physician, registered nurse, or other qualified person or employer thereof shall incur any civil or criminal liability as a result of the medically proper obtaining of such blood specimens when requested in writing by a law enforcement officer[.]

Nowhere within the statutory scheme is there a requirement that the sample be collected in a particular manner, quantity, or in compliance with DOFS guidelines. Instead, the statute requires that the individual performing the chemical analysis of the sample be qualified and follow the testing mandates established by DOFS and that the sample be collected by a qualified individual.

Separate and apart from OCGA § 40-6-392, DFOS's"Toxicology Section Service Manual"("Manual") is available online. See

6

https://dofs-gbi.georgia.gov/document/document/toxicology/download (last accessed November 11, 2025). The Manual sets forth"requirements" for samples submitted to DOFS for chemical analysis. Under the heading "Minimum Sample Requirements," the reader is reminded "[i]t is always better to collect more specimen than will be required for testing than too little sample. Insufficient sample will result in incomplete testing." A chart then appears in the Manual and under the heading of blood, the volume requirement is listed as "[t]wo 7 cc (or larger) grey-stoppered tubes (14 cc total minimum) ([g]rey stoppered tubes are preferred over purple or red stoppered)." The toxicologist who testified at the hearing noted that the statutorily mandated procedures for chemical analysis of a sample are different from the information that is contained within the Manual. She also testified that despite the Manual chart listing the volume of a blood sample to be a "requirement," the amounts that appear in the chart are recommendations, not actual prerequisites to DOFS performing chemical analysis of submitted samples.[2] The toxicologist noted

_____

[2] The trial court found this testimony lacked credibility, but because the testimony goes to the legal import of the content of the Manual in light of the plain language of OCGA § 40-6-392, we consider the testimony as part of our de novo review. In doing so, we note the Manual's repeated references to "preferred" stoppers on blood vials, using certain containers "whenever possible" and similar language conveying elective preferences, makes it difficult to conclude that the

that if the full gamut of testing services offered by the toxicology section were requested on a given sample, that the volume of the blood sample submitted would have to be far more than is needed to solely perform chemical analysis for alcohol content. However, for alcohol concentration testing, the toxicologist testified that she needs "a little bit more" than 200 microliters to perform the tests mandated by DOFS and that there was a sufficient sample submitted in this case to perform the testing as mandated by DOFS.

OCGA § 40-6-392 sets forth the prerequisites for the results of chemical testing to be introduced into evidence in connection with a case involving claims of driving under the influence of intoxicants. In this case, Hamrick does not claim that the chemical analysis performed by the toxicologist was improperly performed. Nor does Hamrick argue that the phlebotomist who drew the blood sample was not qualified under the provisions of OCGA § 40-6-392(a)(2). Instead, he argues that because DOFS has published guidelines and preferences for the collection of samples and because the Manual references those guidelines and preferences as "requirements,"

_____

provisions of the Manual are intended to be mandatory minimums that somehow impact the ability or willingness of DOFS to test submitted samples.

the testing performed here should be deemed inadmissible. His argument ignores the plain language of OCGA § 40-6-392(a).

OCGA § 40-6-392(a) states that the amount of alcohol in a person's blood, as determined by chemical analysis, shall be admissible. When such chemical analysis is performed, the remaining provisions of the statute are applicable. OCGA § 40-6-392(a). As is relevant to this case, those additional provisions provide that the *chemical analysis* shall be performed according to methods approved by DOFS. OCGA § 40-6-392(a)(1)(A) (emphasis supplied). Additionally, the person collecting the sample must be qualified as set forth in OCGA § 40-6-392(a)(2). As it relates to this case, those are the sole prerequisites to the result of the chemical analysis being deemed admissible. The provisions of the Manual are not statutorily mandated to be followed by the individual who collects the blood sample. We agree with the conclusion reached by the trial court who noted that "analysis," as set forth in OCGA § 40-6-392(a)(1)(A), was not intended to encompass the collection of a sample.

Had the legislature intended to require compliance with the Manual to be a prerequisite to the admission of chemical analysis results, it could have made that plain in the statute. The same is true for the collection of the sample. Had the

legislature intended to mandate that collection of blood samples follow the provisions set forth in the Manual, including those related to sample volume amounts and number of vials, it could have included statutory language mandating such compliance. See *Deal v. Coleman*, 294 Ga. 170, 173 (1) (a) (751 SE2d 337) (2013) ("[I]f the statutory text is 'clear and unambiguous,' we attribute to the statute its plain meaning, and our search for statutory meaning is at an end."). "The separation of powers prohibits us from adding a line to a law enacted by the legislature." *Hill v. Kemp*, 366 Ga. App. 19, 25 (1) (880 SE2d 590) (2022) (citation and punctuation omitted).

As we have previously noted, any discrepancy in the amount of blood drawn or tested would go to the weight of the evidence and not its admissibility. *Self v. State*, 232 Ga. App. 735, 738 (4) (503 SE2d 625) (1998); *Swanson v. State*, 248 Ga. App. 551, 552-53 (1) (b) (545 SE2d 713) (2001). The toxicologist who testified at the hearing noted that had the sample submitted been insufficient for the testing mandated by established DOFS procedures, she simply would have reported that the sample was insufficient for analysis. Any failure of the phlebotomist to draw two vials of blood had no bearing on the scientific reliability of the testing performed by the toxicologist and

was not in violation of any of the prerequisites relating to the drawing of a blood sample as set forth in OCGA § 40-6-392. Therefore, the trial court did not commit error in denying Hamrick's motion to suppress.

*Judgment affirmed. Doyle, P. J., and Markle, J., concur.*